Diego F. LOINAZ, et al.,
Plaintiffs, Appellees,

v.

EG&G, INC., Defendant, Appellant.

No. 89–1737.

United States Court of Appeals,
First Circuit.

Heard May 8, 1990.

Decided July 30, 1990.

David Rapaport, Boston, Mass., for defendant, appellant.

Jose E. Fernandez–Sein with whom Law Offices of Nachman & Fernandez–Sein, Rio Piedras, P.R., was on brief, for plaintiffs, appellees.

Before BREYER, Chief Judge, CYR, Circuit Judge, and PETTINE,* Senior District Judge.

PETTINE, Senior District Judge.

The defendant, a Massachusetts corporation, challenges a jury verdict that holds the corporation liable for $750,000 damages in a fraud and breach of contract case. This appeal is based on several grounds. First, the defendant claims that it did not receive a fair trial because it was denied a continuance of the scheduled trial date and then denied permission to present a witness out of turn, thereby compelling the defendant to present deposition testimony, rather than an actual witness, to the jury. Second, the verdict is excessive, contrary to the evidence, and the product of local passion. Third, the defendant asserts that it was denied a fair trial by several evidentiary rulings during trial. Because we find that, under the circumstances of this case, the defendant's first ground for reversal is compelling, we do not reach the other issues.

## BACKGROUND

The broad outline of the facts of this case is not in dispute. The dates, places, leading characters, and general subject matters of conversations are described almost uniformly by all witnesses. However, when the details and nuances are explored the story begins to disintegrate. We will set forth just enough of the outline and disputed details to illuminate the issue.

In 1984 the defendant EG & G, Inc., a Wellesley, Massachusetts, corporation, began exploring the possibility of moving some of its manufacturing operations to locations where the business might receive a favorable tax status. Puerto Rico was one location being considered. John Buckner, the chief financial officer for EG & G, submitted an interim report on the tax advantages of an EG & G manufacturing operation in Puerto Rico to the plaintiff Diego Loinaz. Loinaz was then the president and general manager of Millipore–Waters, a Puerto Rican subsidiary of the Millipore Corporation. Buckner had worked for Millipore before joining EG & G and had at the time established a friendship with Loinaz.

Loinaz analyzed EG & G's tax plan and sent a report to Buckner. In October 1984, several EG & G executives including Buckner and Charles Francisco, senior vice president of EG & G, visited Puerto Rico. Loinaz apparently arranged the agenda for the visit and acted as guide. In December 1984 Loinaz and an associate at Millipore, Sarah Bacon, visited EG & G manufacturing plants in Massachusetts, New Jersey, and Tennessee in order to get an impression of the kinds of manufacturing in which EG & G was involved. Following the tours of the manufacturing plants, Loinaz met with Francisco in Wellesley, Massachusetts, to discuss the possibility of Loinaz and EG & G working together to establish some kind of manufacturing enterprise in Puerto Rico. Of particular interest to Loinaz was a joint venture between EG & G and XXI, Inc., a group Loinaz had formed from past and present employees of Millipore to develop new industrial projects in Puerto Rico. No resolution was reached at this meeting. Francisco and Loinaz agreed to meet again after the New Year to discuss the matter further.

On January 7 and 8, 1985, Loinaz met with Francisco and Buckner in San Juan. The substance of the January 7 meeting is not in dispute. Loinaz presented Buckner and Francisco with a plan, in writing, for a joint venture between EG & G and XXI, Inc. The EG & G executives also heard Loinaz' ideas on how best to establish an industrial enterprise in Puerto Rico. By

* Of the District of Rhode Island, sitting by designation.

the end of the meeting on January 7, it was clear to Loinaz that Buckner and Francisco were not interested in a joint venture, but they were interested in an employment relationship in which Loinaz would join EG & G and help develop an EG & G manufacturing operation in Puerto Rico. This relationship would be discussed the next day.

The contents of the January 8 meeting are shrouded. Loinaz, Buckner and Francisco, the only persons present at the meeting, testified consistently on the subjects discussed, and on many of the details of those subjects. But the accounts vary when it comes to the purpose, resolution, and meaning of each of those subjects. Unfortunately, this divergent testimony cannot be ignored; the understanding reached between the parties to this meeting is crucial to the liability determination. The divergent testimony cannot be written off as memory lapses or misunderstandings. The points of disagreement are too important, the parties too experienced in business dealings, and the memories too self-serving.

The parties have agreed, the defendant only after all the testimony was in, that Buckner and Francisco, acting for EG & G, and Loinaz made an oral employment contract at this meeting. Buckner in his deposition had said that no actual employment offer was made to Loinaz at the January 8 meeting, although they did talk specifics of compensation and at the end of the meeting they believed that they could come to an agreement. Buckner stated that the EG & G offer was to be formalized in a letter to be drafted by Francisco. Loinaz and Francisco each testified that an oral employment agreement was struck on January 8 and that a letter confirming that agreement would be sent soon by Francisco. However, Francisco qualified his testimony by stating that some details were not worked out at the meeting and were to be incorporated later in the letter memorializing the agreement reached at the meeting; these details proved troublesome and the confirming letter was delayed.

The basic components of the oral contract are not contested. First, Loinaz was to give up entirely his involvement with XXI, Inc. EG & G was to compensate Loinaz with a base salary of $100,000, bonuses, standard fringe benefits, and extra fringes that included a car, country club membership, and schooling for his children. Some of the compensation was to be paid in a form that was tax free or tax advantageous. In addition, EG & G would make a one-time payment of $20,000 to Loinaz to make up for benefits he would lose by resigning from Millipore; Sarah Bacon, a Millipore employee and XXI, Inc. member, was to be hired by EG & G to assist Loinaz; and EG & G agreed to pay the leases on certain buildings in Puerto Rico for which Loinaz had retained options. Finally, there was a termination clause that required EG & G to pay Loinaz six months' salary and either recommend him for or give him a distributorship in Latin America for EG & G products.

The disputes arise over the method of compensation, the length of the contract, and the certainty of Loinaz obtaining a distributorship in the event his employment with EG & G was terminated. Buckner and Francisco both testified in deposition that they told Loinaz on January 8 that EG & G would attempt to set up a pay package that would shelter some of his salary from taxes, and one way this might be done was by issuing stock to Loinaz. They testified that they told Loinaz they were not certain this could actually be done; the tax people at EG & G would attempt to put this aspect of the offer together. On the bonus provision, the EG & G executives asserted that any bonus discussed was that given to EG & G executives—incentive compensation based on performance (which at a maximum could equal 50% of compensation)—such bonuses were not assured and were determined on an annual basis. Loinaz' testimony was that these discussions had a much more definite tenor to them. Half of his base compensation—$50,000—was to be tax sheltered. The bonus, which Loinaz says Francisco and Buckner guaranteed, was to be twice the before tax equivalent of his salary plus special fringes.

The duration of Loinaz' employment was another source of great debate. Loinaz

believed he accepted a five-year contract of employment with EG & G; this five years was to cover the full implementation of EG & G's Puerto Rican operation. He conceded that EG & G reserved the option to terminate his employment if a product suitable for EG & G to manufacture in Puerto Rico were not found; this would be known after six months of employment. If EG & G exercised this option, Loinaz would be awarded six months' salary and given a distributorship in Latin America for EG & G products. Again, the EG & G executives' recounting of this aspect of the January 8 meeting manifested less lofty promises and more uncertainty. Both Buckner and Francisco said no promises were made about the length of Loinaz' employment because they did not know if the Puerto Rican plan would work. If the plan was terminated, EG & G would pay Loinaz the equivalent of six months' salary, and Francisco would encourage the general managers of EG & G's companies to be responsive to Loinaz' sales pitch for distribution rights in Latin America.

These disputes over the content of the January 8 meeting were not evident for at least two months. After the meeting, Loinaz tendered his resignation to Millipore, but at that company's request continued to work there until March 1, 1985. During February 1985, Loinaz began work on the feasibility study for EG & G, and several employees from EG & G who would have input into the proposal flew to Puerto Rico to meet with Loinaz. Among those visiting Puerto Rico was Juliana Coyle, a C.P.A. who worked for the comptroller of EG & G on various accounting and tax projects. Loinaz finally arrived at EG & G corporate headquarters in Wellesley on March 4. Up to this time, Loinaz had not received the letter confirming his employment that Francisco had promised to send shortly after the January 8 meeting. The letter was not presented to Loinaz until March 12. When Loinaz finally did receive the letter, he was upset with its contents. Although

he conceded at trial that much of what had been agreed to on January 8 was in the letter, he believed the letter deviated from the agreement in terms of the tax sheltering and the promise of a distributorship if he was terminated. He stated the March 12 letter set forth a "tax sham" that would not legally shelter his income from taxes. The letter was never signed by Loinaz. Although he did not have a signed contract of employment, Loinaz was placed on EG & G's employment rolls at an annual salary of $50,000, continued his feasibility study, and embarked on a long western trip to visit EG & G plants. He was accompanied on this trip by Sarah Bacon and Juliana Coyle.

Both Buckner and Francisco testified that, after the January meeting, they received reports about Loinaz' behavior that made them question their decision to hire Loinaz. In February, Coyle, and perhaps other EG & G personnel who visited Puerto Rico, reported that they had seen documents on XXI, Inc. stationery, and Coyle reported that Loinaz had approached her about working for XXI, Inc. Buckner confronted Loinaz about this in a telephone meeting in February. After the March trip that Loinaz, Coyle, and Bacon took to the west coast, Buckner and Francisco again received unfavorable reports from Coyle about Loinaz' behavior. Of particular importance to Buckner and Francisco, Coyle reported that Loinaz again offered her employment with XXI, Inc. It was Buckner's and Francisco's testimony that these reports of the continued operation of XXI, Inc., which Loinaz had specifically agreed to terminate in January, prompted their decision to terminate their employment relationship with Loinaz in April 1985. On April 25, after attempting to establish a consulting arrangement with Loinaz, EG & G mailed Loinaz a termination notice. In March 1986, Diego Loinaz, Mary Loinaz, and their conjugal partnership filed suit against EG & G in federal district court in Puerto Rico.[1]

---

1. The first of four claims in the Complaint alleged that EG & G fraudulently induced Diego Loinaz to resign from his position with Milli-

pore, and as a result of a reliance on EG & G's representations, Loinaz sustained substantial losses in earnings and mental anguish. In the

On November 30, 1988, the court set Tuesday, March 21, 1989, for the commencement of the trial, which the parties had estimated would take five days. Neither party offered any objection to the date until January 17, 1989, when the defendant moved for a continuance because the wife of the defendant's lawyer was expecting a child in late February. The motion was denied on February 1. Five days before the trial was to begin, the defendant again moved for a continuance, this time on the grounds that several of its witnesses had developed scheduling problems. According to the defendant, Buckner, who now worked for a Minneapolis-based company, was in the middle of a financial crisis with his new firm, and he could not come to Puerto Rico in late March; another witness, Francisco, who had also left EG & G, had just informed the defendant that he would be available only the week of March 20, a week in which there would only be three trial days because of a court holiday on Good Friday. The trial judge denied the motion without opinion.

Trial commenced on Tuesday, March 21. A jury was selected and the plaintiffs began direct examination of Diego Loinaz. At the beginning of the afternoon session on March 22, when the direct examination of Diego Loinaz was still in progress, the defendant requested that it be allowed, under Federal Rules of Evidence 611(a),[2] to present its witness, Francisco, out of turn. The defendant stated that Francisco would be in Puerto Rico later that day but would only be available to testify on Thursday, March 23, as his wife was having elective surgery in New York on Tuesday, March 28. The defendant argued that Francisco was "the most important person in [its] case," Transcript at 164, and was the only witness other than Loinaz who could testify about the January 7 and 8 meetings—

Buckner having refused to come to Puerto Rico. Furthermore, a deposition was an inadequate substitute for the jury to assess the testimony. The plaintiffs objected to this motion, arguing that the court had already denied a motion for continuance based on the same circumstances, and that if the defendant's motion were granted, the plaintiffs would suffer prejudice. According to the plaintiffs, they would be adversely affected because they had not yet presented the witnesses who would corroborate the testimony of Diego Loinaz. To present the defendant's witness when the plaintiffs were just beginning their case would be prejudicial. Further, the plaintiffs quibbled, Buckner, not Francisco, was the key witness for the defendant. Finally, the plaintiffs pointed out that there was a full deposition of Francisco that could be used in place of his live testimony. The court denied the defendant's motion, stating:

> [Y]our request is denied for the following reasons. Your witness, Mr[ ]. Francisco, is not facing an emergency situation as you yourself know. This is a voluntary surgery that his spouse is undergoing. And although I can understand his desire to be next to her, I also have to balance the interest of all parties involved.
>
> This is a case which is an '86 case. It has been scheduled for trial as late as November 28, '88, for the start on March 21, 1989. And [the plaintiffs' lawyer] is correct in the sense that the whole dynamics of the trial in his case would be affected by producing what you call the key witness of the defendant right after this testimony. That is not the way things are done.
>
> The only way that I could allow such alteration in the order of proof is for a

---

second claim, Diego and Mary Loinaz claimed damages for breach of contract and for anguish, anxiety and suffering. Under the third claim the conjugal partnership sought to enforce the liquidated damages clause of the March 12, 1985, letter from Francisco to Diego Loinaz. The plaintiffs sought attorney's fees in the fourth claim.

**2.** Rule 611(a) reads:

Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

very serious situation. But this is more a situation where the other—where the witness referred to, Mr. Francisco, wants an accommodation of his personal interest, and the Court cannot take that into account as the prime factor to allow you to bring him tomorrow as a witness right in the middle of the plaintiffs' case.

So your request is denied.

Transcript at 168–69.

The following day, the defendant renewed his request to present Francisco out of turn, this time presenting the court with a written motion. Appended to the motion was an affidavit by Francisco supporting the earlier statements by the defendant that when Francisco had been contacted by the defendant's lawyer in February and March, he did not inform the lawyer of the surgery, expecting that his testimony in Puerto Rico would be completed before the surgery. The defendant's lawyer justified his predictions that Francisco would testify on March 23, 24, or 27 by pointing to the five-day estimate for the trial. The court again denied the motion:

It would be more reasonable that if [Francisco's] wife had medical obligations he should have told you earlier. This is elective surgery.... The jury could have heard Mr. Francisco if you and he communicated in an effective manner and arrangements could have been made otherwise, but not in this manner. So your motion is denied.

Transcript at 273–74.

The defense opened its case on March 28 by reading the deposition of Buckner. Two witnesses were then presented. The defendant made one final attempt to have Francisco testify in person. It contacted Francisco in New York on March 28 and requested that he return to Puerto Rico to testify. Francisco refused to return to Puerto Rico on either March 29 or 30. Before resting on March 30, the defense read the deposition of Francisco into the record. The case went to the jury on March 31.

The judge instructed the jury that deposition testimony

is entitled to the same consideration and is to be judged as to credibility and weighed by you and considered by the jury insofar as possible in the same way as if the witness had been present here and had been testifying from the witness stand.

Transcript at 1239.[3] The jury returned a verdict that day; they found EG & G liable to the conjugal partnership of Diego and Mary Loinaz for economic damages in the amount of $750,000. The jury did not award damages for mental pain and suffering.[4]

## DISCUSSION

The defendant is asking us to rule that it was denied a fair trial because the judge refused to continue the trial or to permit a witness to be presented out of turn. Such rulings by appellate courts are particularly distasteful. Decisions regarding the management of the trial calendar and the courtroom proceedings are particularly within the province of the trial judge, and her determinations will not be disturbed by us absent a finding that she abused her discretion. *Real v. Hogan*, 828 F.2d 58, 63 (1st Cir.1987) (standard in reviewing rulings on motions for continuance is abuse of discretion); *Zurich v. Wehr*, 163 F.2d 791, 793 (3d Cir.1947) (abuse of discretion standard applied to judge's refusal to depart from regular trial order). Appellate judges, reading sterile, written documents, cannot know all that preceded the challenged judgment, so they must be mindful that there may be factors the record does not reveal. They must also be wary of the tendency to employ hindsight that encompasses the entire case, to consider evidence and circumstances, including the ultimate outcome, that were not available to the judge at the time of her ruling. However, although the view from the appellate court is not perfect, a trial court's

---

**3.** The jury was also instructed that they should consider a witness' manner of testifying before the jury and a witness' candor, fairness, and intelligence.

**4.** The court had directed a verdict for the defendant on the plaintiffs' claim for compensation under the liquidated damages clause of the March 12 letter from Francisco to Diego Loinaz.

discretion is not unlimited. If we believe that the trial judge's discretionary decisions have resulted in undue prejudice to the appellant's case, we will reverse. This Circuit has said that a judge abuses her discretion "when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing those factors commits a clear error of judgment." *United States v. Hastings*, 847 F.2d 920, 924 (1st Cir.) (quoting *United States v. Kramer*, 827 F.2d 1174, 1179 (8th Cir.1987)), *cert. denied*, 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988); *In re San Juan Dupont Plaza Hotel Fire Litigation*, 859 F.2d 1007, 1019 (1st Cir.1988). There is no neat, standardized test for judging abuse of discretion; each case must be judged on its own facts and circumstances. *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964).[5]

■ The denial of the Rule 611 motion by the trial judge in this case resulted in severe prejudice to the defendant in that neither Buckner nor Francisco, the two principal witnesses who could rebut the testimony of the plaintiff Diego Loinaz, was able to testify at the trial. Because of the decision, the defendant could not present to the jury a *person* who would rebut the plaintiffs' version of the facts, a *person* whom the jury could evaluate in the same manner they had Diego and Mary Loinaz. The plaintiffs' presentation of Diego and Mary Loinaz to the jury was very important because the case was not just about some agreement that the plaintiffs claim was broken, it was also about two people who claimed to be harmed by the defendant's actions. The jury got to see the people who claimed that they had been wronged and emotionally scarred by the defendant's actions.[6] Their testimony as witnesses made the case real—here were the man and the woman whose claims the jury must decide. The defendant could offer the jury nothing to compare with the persons of Diego and Mary Loinaz; all they had were "canned" answers read back by an employee of the court. The men who negotiated the oral contract with Diego Loinaz on January 7 and 8, 1985, and who were involved in the decision to terminate his employment later that year were not people who could be observed, judged, and identified with. Francisco's words were read to the jury and was the man described by Diego Loinaz.[7]

The plaintiffs argue that EG & G did not suffer any real prejudice because it was

5. Because we feel there may have been sufficient justification for the judge's denial of the defendant's motion for a continuance because of the unavailability of witnesses, the following discussion will focus on the denial of the motion to present Francisco out of turn. However, the motion for a continuance is relevant to our evaluation of the Rule 611 motion. The continuance motion is evidence that the defendant brought the scheduling problem to the court when it was first known; the defendant did attempt to cure the problem before trial.

The denial of the continuance is supported by several factors. First, the motion was brought only a few days before trial, thus threatening a severe disruption in the court's heavy schedule. Second, the defendant asked that the trial be continued until Buckner was available to testify, but it was not clear that he would be available at any time in the near future. *See Johnson v. Harris County Flood Control District*, 869 F.2d 1565, 1570–71 (5th Cir.1989) (not abuse of discretion to refuse continuance until witness able to testify when unknown if witness would ever be able to testify), *cert. denied*, — U.S. —, 110

S.Ct. 718, 107 L.Ed.2d 738 (1990). Finally, the motion said Francisco could not appear after March 27; the court could justifiably have believed that there would be adequate time for Francisco to testify during the defendant's case in chief.

6. Diego Loinaz testified to the enormous emotional impact his termination had on him, to the humiliation he experienced. Mary Loinaz told the jury that her family was devastated by the firing.

7. It should be pointed out that Francisco's testimony was not cumulative; there was not another defense witness who could testify in court to the critical events. The uniqueness of Francisco's testimony compounds the prejudice suffered when his testimony was presented by deposition. *Cf. Wells v. Rushing*, 760 F.2d 660, 661 (5th Cir.1985) (no abuse of discretion to refuse continuance so witness can testify when witness' testimony merely cumulative). *See also Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 602 (9th Cir.1983) (witness' testimony was material and not cumulative).

able to present the deposition testimony of Francisco, testimony that was detailed and complete. While it is true that the jury did get to hear EG & G's side of the story from depositions, that does not fully address the question of prejudice. The Federal Rules of Civil Procedure that allow the use of deposition testimony in place of live testimony "have not changed the long established principle that testimony by deposition is less desirable than oral testimony and should ordinarily be used as a substitute only if the witness is not available to testify in person." 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2142 (1970). Judge Learned Hand proclaimed the deposition to be "second best, not to be used when the original is at hand." If possible, it is always better if the jury can observe the witness firsthand to judge his or her demeanor. In this case, it was possible for the jury to observe Francisco firsthand, if the Rule 611 motion had been granted.

■ The prejudice to the defendant in this case went beyond that generally suffered by any party forced by circumstances to present deposition testimony instead of an actual witness. This entire case, both that of the plaintiffs and that of the defendant, rested on credibility; even the trial judge in denying a motion for a directed verdict said, "this whole case is full of credibility issues." Transcript at 1168. "With credibility a vital factor, [the party] is entitled to a trial where the jury can observe the witnesses while testifying." *Arnstein v. Porter*, 154 F.2d 464, 469 (2d Cir.1946). Acceptance of the plaintiffs' or the defendant's position in this case must be based on who the jury believes. Buckner and Francisco were testifying to key, and dispositive, events to which only they and Diego Loinaz were privy. If the jury believed their testimony, at a minimum Loinaz' economic damages would be reduced, and at best the jury could have found that the defendant owed nothing at all if they believed Francisco's testimony that Diego Loinaz had breached the agreement. The

defendant had no chance to persuade the jury, observing Francisco's and Buckner's demeanor, that it was worthy of belief. *Arnstein*, 154 F.2d at 470. *Compare Frechette v. Welch*, 621 F.2d 11, 16 (1st Cir. 1980) (because appellant's position not tied to attack on witnesses' credibility, use of witnesses' depositions instead of actual appearance of witnesses is harmless error). All the jury had in this case was the reading, without personification, of a lengthy deposition; they could judge the credibility of the words read, but they could not judge the credibility of the man who spoke the words. When a witness' credibility is a central issue, a deposition is an inadequate substitute for the presence of that witness.

■ That the defendant has suffered prejudice because of a decision by the trial judge does not necessarily mean that the judge has abused her discretion. Other factors that may have entered into the judge's determination, that may weigh against the defendant, must be added to the balance of our decision. Prejudice to the plaintiffs or to the judge's ability to manage her calendar and courtroom may offset the prejudice to the defendant. The prejudice to the defendant will also be diminished if the defendant itself has done anything to promote or establish the prejudice it now claims.

■ The plaintiffs claim that they would have been prejudiced if the testimony of Francisco had been taken out of turn and allowed to interrupt their presentation of their case. Certainly, the general rule is that a party should be able to present his case and order that case as he sees fit. However, Rule 611 has carved out an exception to this general rule and requires the trial judge to control the presentation of evidence in the interest of ascertaining truth. The dynamics of a party's presentation may be compromised when the testimony of an opposing witness is allowed to interrupt that presentation, but Rule 611 recognizes that such an alteration in order may be necessary at times.[8] In this case,

---

8. According to 6 J. Wigmore, Evidence § 1867 (1976):

It is obvious that, while a usual order for introducing topics of evidence and witnesses

the plaintiffs claim the interruption would have been damaging because it would have separated the testimony of Diego Loinaz from that of the corroborating witnesses. Although it is true that the testimony of the plaintiffs' other witnesses was consistent with that of Diego Loinaz, their testimony could not, and did not, corroborate his on the critical issues of what agreements were reached at the meetings on January 7 and 8, 1985, and whether he had offered Juliana Coyle employment with XXI, Inc. The plaintiffs have failed to show that they would have been seriously affected by an interruption in their presentation of evidence. Certainly, their prejudice would not rise near that experienced by the defendant.

Likewise, the trial judge failed to articulate any persuasive reasons that an interruption in the plaintiffs' order of proof would harm the court. The court's schedule would not have been compromised, and any confusion to the jury that the interruption might have created could have been cured by instructions from the judge. It is possible that a court's authority could be threatened by frivolous interruptions in the court's orderly administration of justice. However, this requested interruption was not frivolous, and the simplistic statement by the court that "this is not the way things are done" is inadequate. We are unable to fathom a compelling reason for how this interruption would have injured the court's administration of justice. The administration of justice must have as its goal the "ascertainment of the truth"; enabling the defendant to present Francisco as a witness would certainly have promoted this goal.

The defendant cannot be entirely exonerated from responsibility for the situation that created the prejudice against it. As the trial judge said, the defendant's lawyer should have communicated in a more effective manner with Francisco. In early February 1989 the lawyer had written to Francisco that he would testify on March 23, the lawyer apparently basing this scheduling prediction on the five-day trial estimate. In early March, the lawyer confirmed Francisco's availability on both March 23 and 24. When the lawyer called Francisco the week before trial and told him that he might have to testify on March 27, Francisco told of his wife's surgery scheduled for March 28. The defendant's lawyer should have had the foresight to build some flexibility into his witness appearance schedule and therefore give Francisco notice that his presence in Puerto Rico could be required at a time later than March 23. However, this mistake is not of such proportions that it should have engendered a decision that compromised the defendant's entire case. The trial judge's issuance of blame and her ruling that Francisco's excuses were inadequate for a granting of a Rule 611 motion are misconceived. There was nothing the defendant's lawyer could do to assure Francisco's appearance during the defendant's presentation of its case. The defendant had no control over Francisco. He lived outside the subpoena power of the court, and he was no longer in the employ of EG & G. The defendant was dependent on Francisco's goodwill for his appearance in court. From the defendant's perspective, it did not matter whether Mrs. Francisco's surgery was elective or emergency, the end result was the same—Francisco would not appear in court after March 27. To the credit of the lawyer, he did anticipate the difficulty of securing witnesses in Puerto Rico at the inception of the case when he moved for a change of venue; he also moved for a continuance when he learned of the scheduling problem.

Further, the defendant should not be made to pay for the judge's desire to clear her calendar of old cases when the defendant was not responsible for the delay of the trial. *See Beary v. City of Rye*, 601 F.2d 62, 63 (2d Cir.1979) (court should not allow its zeal for clearing its calendar to overcome party's right to full and fair trial). This case was more than two and a half years old when the date for trial was

is a desirable thing, a variation from that order, which if often equally desirable, will not necessarily cause direct harm; it can do

so only where it tends to confuse the jury, or where it misleads the opponent or finds him unprepared to meet it.

set; however, it was only a year and a half from the date an answer was filed and the first discovery motions made. The answer was delayed because the complaint was not served on the defendant for three and a half months, because the defendant received a 30–day extension to file responsive pleadings, and because the plaintiffs received extensions of over 100 days to file answers to the preliminary motions of the defendant. The case was also delayed in the first half of 1988 when the plaintiffs moved for and received a 45–day stay of proceedings because Mr. and Mrs. Loinaz had filed for bankruptcy. Further, although the defendant twice moved for a continuance of the March 21 trial date, there is no indication that these motions were delaying tactics. *Cf. Grochal v. Aeration Processes, Inc.,* 797 F.2d 1093, 1096 (D.C.Cir.1986) (lack of evidence of deliberate misconduct or tactical delay should have been considered by judge who denied motion for continuance); *Trakas v. Quality Brands, Inc.,* 759 F.2d 185, 188 (D.C.Cir. 1985) (same). *Compare Harmon v. Grande Tire Co., Inc.,* 821 F.2d 252, 256 (5th Cir.1987) (because defendant responsible for earlier delays of trial, refusal to grant continuance not abuse of discretion); *Watson v. Miears,* 772 F.2d 433, 437 (8th Cir.1985) (same). The motion for a continuance because of the expected arrival in February of the lawyer's child was perhaps ill-advised, but certainly understandable and forgivable. There is no indication that the second motion for a continuance was made in bad faith or to delay the trial. In fact, the defendant appears to have been ready to go to trial on March 21 until it learned that Francisco might not be available when needed to testify and the defendant realized that it would have the live testimony of neither key witness.

## CONCLUSION

In weighing the equities for her Rule 611 decision, the judge apparently did not consider the prejudice the defendant would suffer if Francisco could not testify in person. In a case where credibility of witnesses was such a critical factor, the resulting prejudice cannot be ignored simply to avoid interrupting the plaintiffs' case. Furthermore, the judge appeared to place great emphasis on the fact that Mrs. Francisco's surgery was elective, ignoring the fact that the defendant could not require Francisco to change the date of the surgery or order Francisco to appear regardless of the surgery. We cannot accept the judge's lack of flexibility in this situation.

Because the judge failed to consider a factor that should have been given significant weight in her ruling on the Rule 611 motion, and gave improper weight to another factor, we find that the judge abused her discretion. We also find that the defendant has suffered prejudice that could have affected the jury verdict. For these reasons, the judgment of the district court is vacated, and the case is remanded to the district court for a new trial.