Groulx v. SSA                    CV-98-692-B    01/04/00

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**ADRIAN GROULX**

   v.                                    Civil No. 98-692-B
                                      Opinion No. 2000 DNH 027

**KENNETH S. APFEL, Commissioner,**
**Social Security Administration**

**MEMORANDUM AND ORDER**

Adrian Groulx seeks review of a final decision of the

Commissioner of the Social Security Administration (SSA), denying

his application for Supplemental Security Income (SSI) benefits.

I have jurisdiction pursuant to 42 U.S.C. § 405(g) (1994).

Before me are Plaintiff's Motion for Order Reversing the Decision

of the Commissioner (Doc. # 9) and Defendant's Motion for Order

Affirming the Decision of the Commissioner (Doc. # 11).

Groulx applied for SSI benefits on October 22, 1996.  His

application was denied initially and on reconsideration by the

SSA.  On November 26, 1997, an Administrative Law Judge (ALJ)

held a de novo hearing on Groulx's claim.  Groulx and a

vocational expert (VE) testified at the hearing.

On February 19, 1998, the ALJ issued her decision, which

applied the familiar five-step sequential evaluation process set

forth in the SSA's regulations.[1]  See 20 C.F.R. § 416.920 (1999).
At the first three steps of the process, the ALJ found that (1)
Groulx had not engaged in substantial gainful activity since June
15, 1991; (2) Groulx suffered from hypertension, moderate small
airways obstruction, and back pain related to a previous lumbar
laminectomy,[2] impairments that were severe; and (3) Groulx's
impairments did not meet or equal the criteria of any of the
listed impairments.  See Tr. at 22.[3]  At step four, the ALJ found
that Groulx was unable to perform his past relevant work.  See
id.

The ALJ rejected Groulx's claim for benefits at step five of
the evaluation process.  After considering Groulx's functional
capacity, age, educational experience, and work background, the

---

[1]  In applying the sequential analysis, the ALJ must
determine: (1) whether the claimant is presently engaged in
substantial gainful activity; (2) whether the claimant has a
severe impairment; (3) whether the impairment meets or equals a
listed impairment; (4) whether the impairment prevents the
claimant from performing past relevant work; and (5) whether the
impairment prevents the claimant from doing any other work.  See
20 C.F.R. § 416.920 (1999).

[2]  Laminectomy: Excision of the posterior arch of a
vertebra.  Dorland's Illustrated Medical Dictionary 898 (28th
ed.).

[3]  "Tr." refers to the official transcript of the record
submitted to the Court by the SSA in connection with this case.

ALJ concluded that Groulx was capable of performing certain jobs that existed in significant numbers in the national economy. See id. at 22-3. This finding was predicated on the testimony of the VE, who stated in response to a hypothetical question posed by the ALJ that a person with the characteristics outlined in the hypothetical could perform work as a cashier, information clerk, order clerk, production coordinator, surveillance monitor, or assembler. See id. at 21, 23, 69-71. Based on the VE's testimony, the ALJ found that Groulx was not disabled within the meaning of the Social Security Act. See id. at 23.

On October 28, 1998, the Appeals Council denied Groulx's request for a review of the ALJ's decision, rendering the ALJ's decision the final determination of the Commissioner. Groulx then filed the present action in federal court, claiming that the Commissioner's decision should be reversed because: (1) Groulx's claim was prejudiced because his statutory right to representation at the disability hearing was not adequately protected; (2) the ALJ's determination at step 5 of the evaluation process was infected with error and thus was not supported by substantial evidence; and (3) the ALJ's credibility finding was not supported by substantial evidence. Because I agree with the second of these assertions, I reverse the

Commissioner's decision and remand for further proceedings.[4]

## I.  FACTS[5]

Groulx was forty-five years old at the time of his administrative hearing.  He has a general equivalency diploma and has worked as a meat packer, a mason/carpenter, and a dispatcher. He lives in Manchester, New Hampshire.

Groulx first injured his back in August 1984, when he fell down a stairway.  After pursuing more conservative treatment for several years, Groulx underwent his first back surgery, a lumbar laminectomy, in August 1986.

Five years later, in June 1991, Groulx sustained a second injury to his back, this time while at work.  As a result, he was scheduled for five weeks of physical therapy to eliminate lower back pain and increase his range of motion.

Groulx underwent a number of medical tests at Catholic Medical Center ("CMC") in October and November 1991.  Magnetic resonance imaging ("MRI") revealed a scar in the left lateral

---

[4]  Because I find that the Commissioner's decision must be reversed and remanded for the reasons that follow, I render no opinion on the merits of Groulx's other claims on appeal.

[5]  Unless otherwise indicated, the following facts are derived from the Joint Statement of Material Facts (Doc. #12) submitted by the parties.

recess at L4-5, with only a small component of residual disc bulge identified.  A myelogram revealed a midline and right-sided diskal lesion at L4-5.  A CT scan showed a central and right-sided extradural defect, L4-5, which was small to moderate in size.  Dr. Garrett Gillespie stated that based on the MRI, Groulx probably had a recurrent disc in addition to some probable lateral spinal stenosis.  In the discharge summary from CMC dated November 20, 1991, Dr. Gillespie indicated that Groulx remained disabled from his June 1991 injury and would need remedial surgery.

While Groulx was at CMC, he was evaluated by Dr. Robert Brethauer for complaints of coughing and dyspnea.[6]  Examination revealed diffuse expiratory wheezes and rhonchi.[7]  Dr. Brethauer diagnosed probable asthmatic bronchitis, noted that Groulx smoked one and one-half packs of cigarettes per day, and prescribed bronchodilators.

Dr. Gillespie conducted several follow-up examinations of Groulx in 1991 and 1993.  In October 1993, Dr Gillespie expressed

---

[6] Dyspnea: Difficult or labored breathing.  Dorland's Illustrated Medical Dictionary 518 (28th ed.).

[7] Rhonchi: Continuous dry rattlings in the throat or bronchial tube due to a partial obstruction.  Dorland's Illustrated Medical Dictionary 1462 (28th ed.).

his opinion that Groulx was totally disabled and scheduled Groulx for decompressive surgery. Later that month, Groulx underwent back surgery for the second time. The procedure consisted of lumbar laminectomy L4-5, right, with excision of ruptured lumbar disc; decompression right L5 nerve root and cauda equina[8]; foraminotomy[9] L4-5, right; lumbar laminotomy L5-S1, right, with exploration of disc space; decompression right S1 nerve root; and foraminotomy L5-S1, right. Postoperative course and wound healing were satisfactory and Groulx was free of leg pain at the time of discharge. His discharge medications included Tylenol #3 and Flexeril.[10]

While he was hospitalized for surgery, Groulx was seen in consultation by Dr. Stephen Rowe regarding his respiratory status. Dr. Rowe noted that Groulx smoked two packs of cigarettes per day and had been unsuccessful in reducing his

---

[8] Cauda equina: The collection of spinal roots that descend from the lower part of the spinal cord and occupy the vertabral canal below the cord. Dorland's Illustrated Medical Dictionary 280 (28th ed.).

[9] Foraminotomy: The operation of removing the roof of inverterbral foramina, done for the relief of nerve root compression. Dorland's Illustrated Medical Dictionary 650-51 (28th ed.).

[10] Flexeril: A muscle relaxant. Dorland's Illustrated Medical Dictionary 414, 639 (28th ed.).

smoking prior to surgery.  Dr. Rowe diagnosed asthmatic bronchitis in a patient with chronic obstructive pulmonary disease.  He recommended nebulizer treatments and Kefsol, and noted that the most important part of Groulx's treatment would be the cessation of cigarette smoking.

On October 27, 1993, Groulx had a follow-up examination with Dr. Gillespie, who observed the expected amount of post-operative muscle spasm.  Dr. Gillespie recommended that Groulx start on a progressive walking and exercise program.  After another follow-up examination in November, Dr. Gillespie noted that Groulx had become more active.  Dr Gillespie also noted that Groulx continued to have residual muscle spasms and right leg pain, and that Groulx's spinal extension was limited.  To address the muscle spasms, see Tr. at 243, Dr. Gillespie changed Groulx's medication to Robaxisal.[11]

In February 1994, Dr. Gillespie noted that Groulx was up and around without much leg pain.  Groulx reported back pain with any prolonged activity or postural maintenance.  Examination revealed right-sided muscle spasm, spinal extension, and lateral flexion to no more than 30% of normal range; forward bending to somewhat

_____

[11]  Robaxisal: A skeletal muscle relaxant.  Dorland's Illustrated Medical Dictionary 1025, 1469 (28th ed.).

more than 45 degrees; and straight leg raising limited on both sides to about half of normal range. Dr. Gillespie recommended that Groulx get into a training program for a sedentary indoor occupation that required no repetitive bending, lifting, climbing, or crawling, and that would accommodate the need to change posture at will.

At Groulx's next follow-up examination, in August 1994, Dr. Gillespie noted that Groulx had not been placed in a training program. The doctor indicated that Groulx could probably perform "some light sedentary type work." Tr. at 245. Dr. Gillespie added that Groulx "has residual symptomology and obvious limitations and will have throughout his life but does well enough so that he can do some light work." Id.

In 1996, Groulx was seen by Dr. Harvey Silverman in connection with his respiratory condition. Dr. Silverman diagnosed COPD and chronic bronchitis/emphysema, and stated that Groulx could perform sedentary work.

In November 1996, Groulx underwent pulmonary function tests at Elliot Hospital. Pre and post bronchodilator spirometry were performed. Baseline FEV1 (forced expiratory volume) was 79% of predicted, which is just below normal, and FVC (forced vital capacity) was in the normal range at 87% of predicted. After

administration of bronchodilator, FEV1 improved 28% and FVC improved 21%. Dr. William Mezzanotte concluded that Groulx had mild obstructive lung disease with excellent response to bronchodilator.

Dr. William Kilgus performed a consultative examination in December 1996. Groulx reported chronic pain affecting his lower back, with numbness and weakness in his legs. Dr. Kilgus opined that Groulx was suffering from chronic lumbar strain, lumbrosacral instability, and bilateral lumbar radiculopathies. He stated that Groulx could not do work requiring physical activity and recommended vocational rehabilitation. Dr. Kilgus indicated that work involving alternate sitting and standing and using the arms in a nonstrenuous fashion would be best suited to Groulx's condition.

In January 1997, Dr. Rowe examined Groulx, noting chronic bronchitis. Dr. Rowe stated that there was no evidence of disability related to Groulx's pulmonary condition.

Dr. William Windler examined Groulx in February 1997 in connection with Groulx's application for Medicaid. Dr. Windler noted that Groulx had a decreased tolerance for exercise due to his lung condition, that Groulx could only sit or stand for 20-60 minutes due to back pain, and that Groulx's capacity for lifting

was limited by his back condition.  The doctor recommended vocational rehabilitation.

Dr. Mitch Young evaluated Groulx in February 1997. Examination revealed that Groulx's lungs were negative, that a range of motion of the lumbar spine produced some pain, that straight leg raising was negative, and that there was some mild weakness with dorsiflexion.  Dr. Young opined that Groulx could not do heavy work.  At a follow-up examination scheduled to check Groulx's blood pressure, physician's assistant Heather Davis noted hypertension.  As a result, Groulx was counseled on his diet and his use of alcohol and cigarettes.  Groulx was also given prescriptions for Enalapril[12] and Captopril.[13]

In April 1997, Davis noted that Groulx had symptoms of a respiratory tract infection and that his hypertension was beginning to be controlled by medication.  In May, Groulx complained to Davis of difficulty breathing and Davis diagnosed an exacerbation of COPD.  Later that month and at a subsequent

---

[12]  Enalapril: An antihypertensive.  Dorland's Illustrated Medical Dictionary 547 (28th ed.).

[13]  Captopril: An angiotensin-converting enzyme inhibitor used in the treatment of hypertension and congestive heart failure.  Dorland's Illustrated Medical Dictionary 261 (28th ed.).

examination in July, Groulx complained of rectal bleeding.  As of July 1997, Groulx continued to complain of difficulty breathing and had failed to quit smoking.

In December 1997, one month after the administrative hearing, Groulx underwent a second pulmonary function study ordered by the ALJ.  FEV1 was 72% of predicted and FEVC was 83% of predicted.  Bronchodilator brought FEV1 into the normal range at 85%.  Dr. Rowe's overall impression was that Groulx had a moderate airflow obstruction primarily in the small airways with an excellent response to bronchodilator.

## II.  STANDARD OF REVIEW

After a final determination by the Commissioner denying a claimant's application for benefits, and upon a timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the ALJ's decision.  See 42 U.S.C. § 405(g).  My review is limited in scope, however, as the ALJ's factual findings are conclusive if they are supported by substantial evidence.  See Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); 42 U.S.C. § 405(g).  The

ALJ is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence. See Irlanda Ortiz, 955 F.2d at 769. Therefore, I must "'uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion.'" Id. (quoting Rodriguez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

While the ALJ's findings of fact are conclusive when supported by substantial evidence, they "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). I apply these standards in reviewing Groulx's case on appeal.

## III.  DISCUSSION

The key to this case lies in its chronology. While at particular points in the administrative process the ALJ acted carefully and in accordance with the Commissioner's regulations, an analysis of the record in sequence reveals that the ALJ committed several related, if unintentional, errors when considering Groulx's respiratory impairment. Each of these

errors independently supports the conclusion that the ALJ's decision was not supported by substantial evidence.

Prior to the November 26, 1997 administrative hearing, Groulx had been diagnosed by two physicians -- Drs. Rowe and Silverman -- as suffering from chronic obstructive pulmonary disease. See Tr. at 216-17, 230. In November 1996, one year before the hearing, Groulx underwent his first pulmonary function study, which revealed that he had mild obstructive lung disease with excellent response to bronchodilator. See id. at 249. When Groulx appeared at the hearing before the ALJ, he testified that his breathing problem had worsened during the previous year. See id. at 64. As a result, the ALJ ordered another pulmonary function study to update the medical evidence of Groulx's respiratory impairment. See id. at 66, 72-73. This second study, which was conducted in December 1997 by Dr. Rowe, showed that Groulx had a moderate airflow obstruction primarily in the small airways with excellent response to bronchodilator. See id. at 277. Dr. Rowe noted that in comparison to the November 1996 study, the more recent results showed that Groulx's FEV1 had decreased by approximately 200 cubic centimeters. See id.

At the time of the hearing, of course, the results of the second pulmonary function study were not yet part of the record.

-13-

Therefore, the state agency physicians who completed and affirmed the physical residual functional capacity (RFC) assessment prior to the hearing, see id. at 147-53, did not have the results of the second study when they made their assessment.  This RFC assessment concluded that Groulx should avoid concentrated exposure to extreme cold, fumes, dust, and related environmental irritants.  See id. at 151.  The hypothetical that the ALJ posed to the vocational expert (VE) at the hearing generally tracked the environmental limitations indicated in the RFC assessment.  Specifically, the ALJ instructed the VE to assume a hypothetical worker who, among other restrictions, had to "avoid concentrated exposure to respiratory irritants like fumes and chemicals and dust."  Id. at 69.  In response to a hypothetical that included these environmental limitations, the VE identified specific jobs existing in the national economy that such a worker could perform.  See id. at 69-71.

In her written decision, issued approximately three months after the hearing, the ALJ credited the results of the second pulmonary function study, citing that study to support the conclusion that Groulx "had moderate airflow obstruction."  Id. at 17.  The ALJ further concluded that the claimant "would be precluded from working around moderate environmental irritants."

<u>Id.</u>  The decision does not explain how the ALJ arrived at this assessment of Groulx's environmental limitations; nor does it acknowledge that this assessment differs from that contained in the RFC evaluation, which in turn was the basis for the hypothetical question posed to the VE at the hearing.

This recitation is necessary to illuminate two legal errors committed by the ALJ, both of which stemmed from the occurrence of an additional medical study of Groulx's respiratory impairment conducted after the hearing.  First, the ALJ inferred, without the benefit of expert medical opinion, that the moderate airflow obstruction revealed by the second pulmonary function study correlated with a need to avoid moderate environmental irritants.  While this inference may have a certain semantic logic to recommend it, it is nonetheless a medical judgment that the ALJ was not competent to render.

The First Circuit has consistently held that an ALJ is "not qualified to interpret raw medical data in functional terms." <u>Nguyen</u>, 172 F.3d at 35; <u>see</u> <u>also</u> <u>Manso-Pizarro v. Secretary of Health and Human Servs.</u>, 76 F.3d 15, 17 (1st Cir. 1996) (per curiam); <u>Gordils v. Secretary of Health and Human Servs.</u>, 921 F.2d 327, 329 (1st Cir. 1990) (per curiam).  Determining the environmental restrictions that result from a moderate airflow

-15-

obstruction requires "more than a layperson's effort at a commonsense functional capacity assessment." Manso-Pizarro, 76 F.3d at 19. In the present case, the ALJ should have sought guidance from a medical expert when reassessing Groulx's functional capacity in light of new medical evidence showing that Groulx suffered from a moderate -- rather than mild -- airflow obstruction. See id. at 17-19. The ALJ's failure to seek expert advice, and the resultant lack of any support for the conclusion that Groulx must avoid moderate exposure to environmental irritants, constitutes sufficient basis for remand. See id. at 19; see also White v. Secretary of Health and Human Servs., 910 F.2d 64, 65 (2d Cir. 1990) (noting that "the failure to specify the basis for a conclusion as to residual functional capacity is reason enough to vacate a decision of the Secretary").

The ALJ also erred by relying on the VE's testimony after it became apparent that the hypothetical posed to the VE no longer accurately reflected the extent of Groulx's respiratory impairment. An ALJ is entitled to rely on the testimony of a VE "as long as there was substantial evidence in the record to support the description of [the] claimant's impairments given in the ALJ's hypothetical to the [VE]." Berrios Lopez v. Secretary of Health and Human Servs., 951 F.2d 427, 429 (1st Cir. 1991)

(per curiam); see also Arocho v. Secretary of Health and Human Servs., 670 F.2d 374, 375 (1st Cir. 1982). In the present case, the problem is that the medical evidence of Groulx's respiratory impairment was supplemented after the hearing by the results of the second pulmonary function test, which the ALJ ordered at the hearing and credited in her decision. Therefore, while the hypothetical the ALJ posed to the VE accurately reflected the medical evidence of Groulx's respiratory impairment at the time of the hearing, it did not (and could not) take into account the results of the second pulmonary function study, which indicated that Groulx's pulmonary obstruction had progressed from "mild" to "moderate." Because the ALJ's hypothetical relied on an RFC assessment that did not incorporate credited medical evidence of the extent of Groulx's respiratory impairment, the VE's testimony does not support a finding that Groulx was not disabled. See Rose v. Shalala, 34 F.3d 13, 19 (1st Cir. 1994); Nguyen v. Chater, 100 F.3d 1462, 1466 n.3 (9th Cir. 1996).

While it is possible that the results of the second pulmonary function study would not have appreciably altered either Groulx's functional limitations or the VE's testimony, neither the ALJ nor I, as laypersons, are qualified to make that determination. In this case, the ALJ acted commendably by

-17-

ordering an additional medical test in response to Groulx's complaint at the hearing that his respiratory impairment had worsened. However, once the ALJ credited the results of that test, she was obligated to seek expert advice to determine whether the new evidence of impairment would affect either the RFC assessment or the VE's analysis.[14]

## IV. CONCLUSION

Accordingly, I reverse the Commissioner's decision and remand for further proceedings with instructions that, in

---

[14] The present case is distinguishable from Rodriquez v. Secretary of Health and Human Servs., 915 F.2d 1557, No. 90-1039, 1990 WL 152336 (1st Cir. Sept. 11, 1990) (per curiam) (table, text available on Westlaw), in which the First Circuit rejected a claimant's contention that the ALJ and/or the Appeals Council should have sought additional VE testimony based on medical evidence submitted after the claimant's hearing. First, the claimant in Rodriquez was represented by counsel, who neither requested that the VE reconsider his opinion in light of the subsequent evidence nor suggested how that evidence may have affected the VE's opinion. Id. at *3. In the present case, Groulx was not represented by counsel at either the hearing or Appeals Council stages of the process. Second, the Rodriquez Court found that the evidence submitted after the hearing was not significantly different from the evidence considered by the ALJ and VE at the hearing. See id. at *3-4. As noted above, the second pulmonary function study performed on Groulx seems to suggest some change in the impairment. The extent and significance of that change is not readily apparent to a layperson. Finally, the subsequent evidence in Rodriquez came from the claimant, see id. at *2-3, while the subsequent evidence in the present case resulted from testing ordered by the ALJ herself.

reaching a new decision, the ALJ obtain the expert opinion necessary to determine the functional and vocational limitations related to Groulx's respiratory impairment.  Plaintiff's motion for an order reversing the decision of the Commissioner (Doc. #9) is granted, and Defendant's motion for an order affirming the decision of the Commissioner (Doc. #11) is denied.  Because I am acting pursuant to sentence four of 42 U.S.C. § 405(g), the Clerk is instructed to enter judgment forthwith in accordance with this order.  See Shalala v. Schaefer, 509 U.S. 292, 296, 299 (1993).

SO ORDERED.


_____
Paul Barbadoro
Chief Judge

January 4, 2000

cc: Raymond J. Kelly, Esq.
    David Broderick, Esq.