**Cleon E. PITCHARD, Plaintiff, Appellant,**

v.

**Richard SCHWEIKER, Secretary of Health and Human Services, Defendant, Appellee.**

No. 82–1391.

United States Court of Appeals, First Circuit.

Argued Sept. 15, 1982.

Decided Nov. 4, 1982.

Donald L. Becker, Belmont, Mass., with whom Raymond J. Kelly, and Kelly & Duddy, P.A., Manchester, N.H., were on brief, for plaintiff, appellant.

Helen J. Forsyth, Asst. U.S. Atty., with whom W. Stephen Thayer, III, U.S. Atty., Concord, N.H., was on brief, for defendant, appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

In this social security case the district court held that the administrative law judge's (ALJ) denial of disability insurance benefits was based on substantial evidence. Claimant, Cleon Pitchard, appeals on the grounds that the ALJ's decision was contrary to the weight of the evidence and not supported by necessary findings of fact.

Claimant is a fifty-four-year old married veteran living in Francestown, New Hampshire. He has a high school diploma and two years of college in art and advertising. He worked for four years in advertising and production of a trade magazine at a Los Angeles publishing firm and then for three years in his own firm advertising the products of small industrial accounts. In 1972, claimant quit this advertising work and moved from Los Angeles to New Hampshire. There, using the experience he had in civil engineering and carpentry, he began to build a home.

In 1974, with 30% of the house built, claimant had to stop further work on it. He was afflicted with sharp, shooting pains on the upper right side of his face. His condition was diagnosed as trigeminal neuralgia. The pains persisted. After three years of various unsuccessful types of treatment, claimant underwent surgery which relieved the shooting pains. Sometime after the operation, however, claimant began to experience a burning pain and a tremendous pressure in his head. The pain and pressure caused fatigue, dizziness, and occasional bleeding in his ear. It is this condition that claimant alleges permanently disabled him. Claimant also suffers from pain in his left shoulder. This was first noticed in 1977 and has become worse since then. Claimant testified that his overall condition is worse today than it was in 1976, the year he alleges as the onset of disability.

Claimant first filed for disability insurance benefits in November of 1977, alleging an inability to work since 1973. This claim was denied initially and not pursued fur-

ther. Claimant applied a second time in December 1979, alleging an inability to work since his operation in September 1976. This application was denied on March 3, 1980. A hearing was requested and granted. At the hearing, claimant was represented by counsel.

Claimant was the only witness at the hearing. He described his medical condition since the operation as a tremendous, constant pressure in his head that adversely affects his vision and everything he does. In response to the ALJ's question if the pressure was "aching or painful or just plain pressure," claimant testified:

> It's difficult to describe. It seems more like a pressure, but it affects everything I do. If I work over an hour, say, I get physically tired and sometimes even have to doze off in a chair, and I get dizzy if I bend over, I get very dizzy and then if it's real bad, that's when I do bleed from the ear.

The bleeding is not profuse, but "cakes up" in claimant's right ear. He testified that any type of lifting, even driving or mowing the lawn can cause the bleeding. It occurs on the average of once every three weeks. Claimant said his shoulder was subject to flare-ups, when the pain became so intense it was difficult to lift his arm or sleep at night. Claimant testified that he does small chores around the house. These include mowing the lawn on a riding mower (this takes two hours, but claimant does not do it all at once), going to the market (but not lifting full grocery bags), doing small painting or papering jobs in the house and driving an average of one hundred miles each week. He spends a lot of time just relaxing, depending on how he feels. He made one recent attempt to play golf, playing nine holes, but said this caused too much pain. Claimant testified he can go for short walks. He testified that he drove twenty miles to the hearing but in his request for reconsideration noted that this drive caused him extreme pain.

Claimant testified that he did not think that in 1977 he could have returned to his former work in advertising and that he would not have been able to hold a steady job since 1974 because of his physical condition. He further stated that were it not for his physical afflictions he would have returned to work in advertising after he completed building his house. He did not give any details about the physical and mental requirements of his advertising work.

The medical evidence can be summarized as follows. Reports by Dr. Miner and Dr. Sylman before claimant had surgery note intense shooting pains in the upper right side of the face and concur in the diagnosis of trigeminal neuralgia. Various treatments, including alcohol blocks, a root canal, and prescriptions of Dilantin and Tegretol, were used during the three years prior to the operation. In 1976 the treatments were no longer providing adequate relief and in September claimant underwent exploratory surgery. Dr. Indorf's report describes the surgery and notes some relief. Dr. Rozario's March 11, 1977 report describes the claimant as doing extremely well in remission of his symptoms of trigeminal neuralgia. Claimant's only complaint at this time was numbness in the perioral region (mouth) on the right side. Dr. Rozario states claimant's "trigeminal neuralgia is not in existence at this point and he represents a good operative result."

Dr. Selland's report of July 1, 1977, is the first to describe a "burning type pain in the R post auricular region, extending to his forehead and R eye; usually occurs under stress." The doctor's diagnosis was greater occipital neuralgia.

Dr. Gollomp, in his October 7, 1977 report, also diagnosed greater occipital neuralgia and found the condition was probably secondary to the earlier surgery. He expected the neuralgia would be a chronic problem. Dr. Gollomp also found claimant's "left shoulder pain is probably secondary to DJD of the shoulder joint and also bursitis."

The first medical report describing claimant's shoulder problem is dated June 1977. It indicates pain and limitation of motion in the left shoulder, but further states that internal and external rotation shows no bone or joint pathology, and no periarticu-

lar calcification. Claimant was next seen after slipping on the ice and falling on his left side. The reports from this incident indicate no substantial shoulder injury. Dr. Paulino's June 1979 X-ray report notes "no evidence of fracture or dislocation, ... slight sclerosis and irregularity of the surface of greater tuberosity of the humerus, ... calcific density of 8mm in adjacent soft tissue consistent with calcification of the supraspinatus tendon." The doctor diagnosed the condition as peritendonitis calcarea. Claimant had physical therapy for his shoulder condition. The initial report for this therapy notes claimant had a painful left shoulder for eight months—with limitation of motion. His medical certificate and history indicates that he had pain in his left shoulder for a fairly long duration which became acute and lasted a few days; the diagnosis was acute bursitis.

The Veterans Administration found claimant to be 50% disabled. Its report stated:

> The nature of the veteran's trigeminal pathology which is productive of incapacitating bouts of pain coupled with his age, employment background in sales advertising and resultant contact with the public, educational background, and other related factors will preclude return to substantially gainful employment.

Other evidence in the record includes the disability applications which claimant filed. In his first application, claimant did not answer several questions: one asked how his illness prevented him from performing his usual job duties; another called for a description of the physical activity (lifting, standing, walking) involved in his past work; another asked if his usual job required the use of machines, tools, equipment, technical knowledge or special skills, or supervisory responsibilities. The caseworker who interviewed claimant found that he indicated he had pain in his head at the time of the interview, which was con-

stant, but that he conducted himself well considering any such pain.

In his second application, the claimant described his former work as follows: "I worked in advertising—creating promotional ideas—campaigns—travel to potential customers—sales work to sell ad campaigns—travel 25%—desk/office work—telephone work—no supervisory responsibilities—write-up promotional work—write reports on results." He described his household maintenance chores as "light work around the house—but after 10 minutes work I must stop. I don't do much else because I can't. I can't lift anything over 20 lbs. without getting headaches." He described his hobbies as drawing, sketching, and reading if his head does not hurt. He stated he could drive "but not much because the head pain develops." He claimed that, in addition to constant pressure, weakness, and fatigue, his memory was affected. The caseworker who interviewed claimant noted he had difficulty remembering details but found (as did a subsequent interviewer) that claimant had no observable difficulty reading, writing, answering, hearing, sitting, understanding, using hands, breathing, seeing, or walking. In the application claimant consistently reported that doctors had placed no restrictions on his activities. Doctors told him, he reported, that his condition would be a chronic problem.

After a detailed review of the medical evidence, the ALJ found that the claimant suffered from a "significant impairment" which existed prior to December 31, 1977, the date claimant was last insured. This impairment, the ALJ found, consisted of trigeminal neuralgia and greater occipital neuralgia. The ALJ found claimant's bursitis was not severe until June 1979. Despite his significant impairment, the ALJ found claimant able to engage in his past work as an advertising and sales executive or consultant.[1]

---

1. The ALJ's opinion stated:

Although as noted above, there is clear evidence to support the claimant's complaints of pain, numbness, periods of dizziness and short periods of weakness from these condi-

tions, his testimony also establishes that these conditions would not prevent his engaging in light or sedentary work activity. Thus, at the hearing the claimant testified that he continued to mow his lawn with the

In reviewing the denial of disability benefits, we cannot disturb findings of fact if supported by substantial evidence. *Thomas v. Secretary of Health and Human Services,* 659 F.2d 8, 10 (1st Cir.1981); 42 U.S.C. § 405(g). In determining the substantial evidence question we keep in mind that the claimant, in a case of this sort, carries the initial burden of "showing a disability that prevents a return to his former employment." *Pelletier v. Secretary of Health, Education and Welfare,* 525 F.2d 158, 160 (1st Cir.1975); *see also Gonzalez Perez v. Secretary of Health, Education and Welfare,* 572 F.2d 886, 887 (1st Cir.1978). Claimant here, who was represented by counsel, submitted no evidence at the hearing and only a mere scintilla in his second application as to what the physical and mental demands of his prior work in advertising were. All the ALJ knew was that claimant's advertising work entailed the following: spending 25% of his time in traveling to potential customers, but no mileage estimate was given; doing desk and office work with no supervisory responsibilities; and writing promotional material and reports on the results of advertising campaigns. There was no explanation by claimant as to why he could not return to this work.[2]

With the exception of the VA assessment there is no medical evidence that claimant is permanently disabled. In fact, claimant reported that his doctors had placed no restrictions on his activities. Claimant's description of his daily activities does not rule out a return to the advertising work he had been doing prior to his retirement. The reports of the caseworkers who interviewed claimant also support a finding that claimant could return to his former employment.

We do not think that the ALJ's finding of a "significant impairment" contradicts his conclusion that claimant could engage in his past work in advertising. Many people are able to work despite a significant impairment. Claimant assumed that he could not return to his former employment, but made no attempt to do so.

We rule that the ALJ's decision was supported by substantial evidence.

*Affirmed.*

---

use of a riding lawnmower, that he drives 100 miles weekly and that he does household repairs including interior painting around his home. Clearly, these levels of physical exertion do not support a finding that the claimant could engage in his past work activity as a carpenter, however, they do support a finding that he could engage in his past work activity as an advertising and sales executive or consultant.

2. The claimant's failure to introduce evidence supporting his asserted inability to return to advertising work cannot be fairly charged to the ALJ. To be sure, the Secretary's regulations require the ALJ, after finding a significant or severe impairment, to inquire into the "physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e) (1980). Claimant would have us read this regulation as requiring the ALJ to conduct his own independent investigation and dredge up relevant information concerning the claimant's capacity to perform advertising work. We find nothing in the regulations, however, to suggest that the Secretary meant to shift the burden of production in this regard from the shoulders of the claimant to those of the ALJ. At least in usual circumstances, the burden of presenting the relevant evidence is on the claimant.