Zownir v. SSA                                    CV-99-216-B   03/29/00
                     UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW HAMPSHIRE


OLGA ZOWNIR


     v.                                          Civil No. 99-216-B
                                                 Opinion NO. 2000 DNH 080


KENNETH APFEL, Commissioner,
Social Security Administration



                          MEMORANDUM AND ORDER

     Olga Zownir ("Zownir") applied for Title II Social Security

Disability Income ("SSDI") benefits on June 8, 1996, alleging

disability since October 1, 1987.  After the Social Security

Administration ("SSA") denied Zownir's application, she requested

a hearing before an Administrative Law Judge ("ALJ").  ALJ

Frederick Harap held a hearing on Zownir's claim on March 25,

1997.  On April 25, 1997, the ALJ found that Zownir was "not

disabled" at any time prior to the expiration of her insured

status on December 31, 1992.[1]  On March 19, 1999, the Appeals

_____

     [1]     Although documents in the record indicate that Zownir's
last date of insured status was December 31, 1988, the decision
identified December 31, 1992 as her last date of insured status.

Council denied Zownir's request for review, rendering the ALJ's decision the final decision of the Commissioner of the SSA.

Zownir brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (1994) (the "Act"), seeking review of the Commissioner's decision denying her claim for benefits.

For the reasons set forth below, I conclude that the ALJ's decision to deny Zownir benefits was supported by substantial evidence. Therefore, I affirm the Commissioner's decision and deny Zownir's motion.

## I.  FACTS[2]

Zownir was born in the Ukraine on June 22, 1942 and was 45 years old when she alleges that she became disabled. She has a Ph.D. in Biochemistry and speaks English. Zownir's past relevant employment includes work as a biochemical research assistant, a research associate, and a post-doctoral research associate at

_____

[2] Unless otherwise noted, the following facts are taken from the Joint Statement of Material Facts submitted by the parties.

several hospitals and universities in the United States from 1979 until she resigned her position on June 11, 1987 due to health problems.

Zownir claimed that her mental and physical impairments relate back to a dental procedure she underwent in 1984. In December of that year, Zownir was treated for a problem with her #4 tooth. This treatment involved placing hydroxyapatite[3] crystals into the bone tissue. During this process, she sustained a vertical fracture which led to a recurrent infection. See R. at 163.[4] Zownir subsequently experienced pain and depression that she attributed to the hydroxyapatite. See id. at 228, 231. In January 1985, Zownir's #4 tooth was extracted due to the recurrent infection. See id. at 309, 323. Progress notes written on January 29, 1985, indicated that Zownir stated she

---

[3] Hydroxyapatite is "a natural mineral structure that the crystal lattice of bones and teeth closely resembles." Stedman's Medical Dictionary 735 (25th ed. 1990).

[4] "R." refers to the official record submitted to the Court by the SSA in connection with this case.

felt better.  See id. at 321.  On February 14, 1985, Zownir's treating physician, Dr. Stanley Satterfield, noted that she believed that she was much better.  On March 4, 1985, he noted that the "right maxilla is healing well."  Id.

Zownir complained of sinus pain and a nasal discharge of the hydroxyapatite material used in the 1984 procedure. Pathological studies, however, were negative.  Sinus x-rays conducted in May 1986 showed minimal hypoplastic maxillary antrum,[5] otherwise normal sinuses, and no evidence of sinusitis.

In May 1986, Zownir sought dental care in Hamilton, Ontario, where an oral examination yielded unremarkable results.  Concerned about the nasal discharge of hydroxyapatite, Zownir opted to have the material surgically removed.  See id. at 177.  While in Hamilton, she underwent a successful excision of the

---

[5]     Hypoplastic pertains to hypoplasia which, when pertaining to enamel, means "a developmental disturbance of teeth characterized by deficient or defective enamel matrix formation." Stedman's Medical Dictionary 753 (25th ed. 1990).  Maxillary means "relating to the maxilla, or upper jaw."  Id. at 927. Antrum is "any nearly closed cavity, particularly one with bony walls."  Id. at 101.

hydroxyapatite material.  Dr. Barrie Harnett, Zownir's treating physician, later wrote that it was impossible to remove all of the hydroxyapatite and that he could not offer an opinion regarding her alleged disability.

On May 8, 1986, Zownir's treating physician in Colorado Springs, Dr. Steinhour, urged Zownir to seek psychiatric counseling due to her somatization[6] with paranoid features. Zownir refused to seek such counseling.  See id. at 167.  On October 7, 1986, another physician, Dr. Bruce Jafek, wrote that Zownir's nose appeared entirely normal and that there was no evidence of present or prior sinus disease.  Clinical notes written the next day indicate that Zownir was complaining of pain in her teeth and of a metallic taste in her mouth.  The notes state that "[Zownir] ha[d] traveled to Denver and Canada seeking relief from these problems."  Id. at 168.  An oral surgeon in Denver found "nothing significantly wrong" and referred her to an

---

[6]     Somatization means the "[c]onversion of anxiety into physical symptoms."  Stedman's Medical Dictionary 1434 (25th ed. 1990).

ear, nose, and throat specialist who reached the same conclusion. Id.

Between October 1986 and November 1987, Zownir was treated by Dr. H. A. Huggins in Colorado Springs. In January 1987, five months prior to Zownir's alleged onset date, Dr. Clayton Mammel stated that the conservative regimen followed by Dr. Huggins was an appropriate treatment of Zownir's complaints. On May 20, 1987, Zownir's treating physician in Colorado Springs, Dr. John J. Bell, noted that "depression drove [Zownir's] periodontal pain." Id. at 173. On June 12, 1987, Dr. Bell noted that Zownir never tried the medication he advised her to take for periodontal pain because she "does not like to take medicines." Id. at 173-74. In August 1987, Dr. Huggins opined that Zownir was "biochemically compromised" and, more specifically, that "[h]eavy metals such as she has been exposed to alter excreting mechanisms, cell membrane chemistry, intracellular reactions, and most important, alter a person's threshold response to other exposures." However, Dr. Huggins concluded that Zownir was not

mechanically injured and that she was able to work in a different area in the same vocational field. See id. at 324.

On October 31, 1987, Dr. Onstad reported that he and another physician (Dr. Salvo) both felt that Zownir's physical condition was not consistent with her subjective complaints. Both doctors suggested other medical treatment, particularly psychiatric assistance. Zownir declined to take the physicians' advice. Instead, she took the advice of Drs. Griffin and Huggins and had seven teeth removed. Immediately after the surgery, Zownir had a psychotic reaction during which she became paranoid and suicidal. She was transported to Cedar Springs Hospital in Colorado for evaluation and treatment; in-patient hospitalization was

recommended but Zownir did not follow this recommendation.  See id. at 215, 232.

On February 27, 1988, Zownir was examined by Dr. Donald Vereen at Massachusetts General Hospital.  The doctor's notes indicate that Zownir had "delusions about needing to have her teeth removed to cure her."  Id. at 225.  She was assessed as suffering from paranoid psychosis, but records indicate that it was "unclear if this really related to some heavy metal contamination or is related to some affective process."  Id. Zownir was then referred to Seacoast Mental Health Center, in Portsmouth, New Hampshire.  Prior to March 1988, Zownir was evaluated by three psychiatrists but she "did not follow through with treatment with any of these psychiatrists."  Id. at 232.

On March 11, 1988, Dr. Edward Drummond, a psychiatrist from the Seacoast Mental Health Center, reported that Zownir suffered from discomfort and major depression and that hydroxyapatite was not the cause of her symptoms.  A mental exam of Zownir showed that she was alert, pleasant and superficially cooperative; there

was no evidence of aphasia; her mood was "depressed"; her thought

process was unremarkable; her thought content showed mild

paranoid ideation; and her intelligence was above average.  See id. at 228.  Later that month, Zownir began intermittent outpatient care at Seacoast Mental Health Center with Dr. Drummond as her treating psychiatrist.

In April 1988, a physician at Portsmouth Regional Hospital assessed Zownir's complaints of chest wall syndrome and chronic maxillary gingival discomfort.  Zownir's EKG and chest x-rays were normal and she was prescribed Ibuprofen as needed.

In a telephone conversation with Dr. Drummond on April 4, 1988, Dr. Huggins stated that "the toxic reaction [to hydroxyapatite by Zownir] is similar to ones that he sees in patients with dental fillings such as mercury."  Dr. Drummond responded by stating that Zownir exhibited a number of psychiatric symptoms prior to the implantation of the hydroxyapatite that were characteristic of recent immigrants. See id. at 236.

On June 24, 1988, Dr. Drummond noted that Zownir was "doing well at this time and has no specific complaints."  Id. at 241.

Dr. Drummond noted that from March 1988 to November 1989, after adjustment of Zownir's antidepressant medication, her symptoms had improved, she had more energy, her EKG was normal, and her sleeping and appetite had returned to normal. See id. at 229-30; 235-46.

On January 6, 1989, Dr. Drummond noted that "[a]s the patient had not been having any psychotic symptoms for the past three months, I will discontinue the small dose of Trilafon that she was on." Id. at 246. The doctor added that "[t]he patient stated that she was doing well at this point and that she had no complaints." Id. By May 25, 1989, Dr. Drummond's notes indicate that Zownir's thoughts were totally normal: "[t]he patient stated that she has become more involved in her daily life and has taken trips to the White Mountains and is more involved in doing things." Id. at 250. On September 19, 1991, Dr. Drummond stated that Zownir had "[r]ecovered," and that she was not disabled. Id. at 253-54.

On December 9, 1991, Zownir visited Dr. Jonathan Holzaepfel

in Portsmouth, New Hampshire for treatment of a right wrist fracture that she sustained after falling on ice at a supermarket.  The fracture had been reduced with a short arm cast, her neurovascular exam was intact, there was minimal tissue swelling, and no medication was indicated.  By January 1992, Dr. Holzaepfel reported that Zownir was comfortable; she continued to perform activities as tolerated and her cast was removed at the end of the month with a recommendation for occupational therapy.

In an SSA disability report and medical history form, Zownir indicated that her daily activities included: house cleaning, cooking, shopping, doing laundry, reading, writing, walking, listening to music, gardening, attending the theatre, attending concerts (opera), visiting museums, visiting art galleries, restoring furniture, going on picnics, watching television, skiing, visiting family and friends, and driving.  See id. at 93, 102, 103, 107, 329.

## II. STANDARD OF REVIEW

After a final determination by the Commissioner denying a claimant's application for benefits, and upon timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the ALJ's decision. See 42 U.S.C. § 405(g). My review is limited in scope, however, as the ALJ's factual findings are conclusive if they are supported by substantial evidence. See Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); 42 U.S.C. § 405(g). The ALJ is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence. See Irlanda Ortiz, 955 F.2d at 769. Therefore, I must "'uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion.'" Id. (quoting Rodriquez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). If the ALJ has misapplied the law or has

-13-

failed to provide a fair hearing, however, deference to the ALJ's decision is not appropriate and remand for further development of the record may be necessary.  See Carroll v. Secretary of Health and Human Servs., 705 F.2d 638, 644 (2d Cir. 1983); Slessinger v. Secretary of Health and Human Servs., 835 F.2d 937, 939 (1st Cir. 1987) (per curiam) ("The [ALJ's] conclusions of law are reviewable by this court.").  I apply these standards in reviewing the issues that Zownir raises on appeal.

## III.  DISCUSSION

The Social Security Act defines "disability" for the purposes of Title II as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A) (1994).  In evaluating whether a claimant is disabled due to a physical or mental impairment, an ALJ's

analysis is governed by a five-step sequential evaluation process.[7] See 20 C.F.R. § 404.1520 (1999). The Commissioner has provided an additional evaluation process that an ALJ must apply when, as in the present case, a claimant alleges a mental impairment. See 20 C.F.R. § 404.1520a (1999). To determine the severity of a mental impairment, an ALJ must rate the degree of functional loss in four areas that the Social Security Act has identified as essential to work: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) deterioration or decompensation in work or work-like settings. See 20 C.F.R. § 404.1520a(b)(3); Figueroa-Rodriguez v. Secretary of Health and Human Servs., 845 F.2d 370, 372 (1st Cir. 1988) (per curiam). Absent significant evidence to the contrary,

_____

[7] The ALJ is required to consider the following five issues when determining if a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that lasted for twelve months or had a severe impairment for a period of twelve months in the past; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents or prevented the claimant from performing past relevant work; and (5) whether the impairment prevents or prevented the claimant from doing any other work. See 20 C.F.R. § 404.1520 (1999).

-15-

a claimant's mental impairment can be presumed to be non-severe if the degree of limitation caused by the impairment is "none" or "slight" in the first and second of these essential areas, "never" or "seldom" in the third area, and "never" in the fourth area.  See 20 C.F.R. § 404.1520a(c)(1); Figueroa-Rodriguez, 845 F.2d at 372.

In the present case, the ALJ denied Zownir's claim at step four of the five-step sequential process.  "At step 4 a claimant will be found not disabled when he or she retains the [residual functional capacity ("RFC")] to perform 'the actual functional demands and job duties of a particular past relevant job.'" Santiago v. Secretary of Health and Human Servs., 944 F.2d 1, 5 (1st Cir. 1991) (per curiam) (quoting Social Security Ruling ("SSR") 82-61, 1982 WL 31387, at *2 (1982)).  In making a step four determination, the ALJ must ascertain "the physical and mental demands of claimant's prior relevant work and then decide whether claimant could meet them given her RFC."  Berthiaume v. Apfel, Civ. No. 98-419-M, slip op. at 4 (D.N.H. Sept. 30, 1999);

see also Santiago, 944 F.2d at 5.

The Act places the burden on the claimant to establish the existence of a disabling impairment.  See Bowen v. Yuckert, 482 U.S. 137, 146-47 (1987); Santiago, 944 F.2d at 5.  The claimant must adequately explain what her past work responsibilities entailed and why she was unable to perform those duties during the relevant time period.  See id.; Pitchard v. Schweiker, 692 F.2d 198, 201 (1st Cir. 1982).  To satisfy her burden, the plaintiff must prove that her impairment prevents her from performing her former type of work.  See Gray v. Heckler, 760 F.2d 369, 371 (1st Cir. 1985) (citing Goodermote v. Secretary of Health and Human Servs., 690 F.2d 5, 7 (1st Cir. 1982)).

The ALJ determined that Zownir failed to meet her burden to demonstrate that she was unable to return to her past work.  He also found no convincing objective medical evidence to substantiate her alleged inability to perform her past relevant work.  See R. at 20-21.  Accordingly, the ALJ concluded at step four that Zownir was not disabled within the meaning of the

Social Security Act.

On appeal, Zownir claims that the Commissioner's decision should be reversed because: (1) the ALJ failed to fulfill his heightened duty to develop the record and obtain relevant facts for an unrepresented claimant; (2) the ALJ improperly discounted Zownir's mental impairment as non-severe; (3) the ALJ's decision that Zownir had the RFC to perform her past relevant work was not based on substantial evidence; and (4) the ALJ did not properly evaluate Zownir's subjective complaints of pain.

## A.   ALJ Upheld His Heightened Duty To Assist Zownir

Because social security proceedings are not strictly adversarial, an ALJ has a responsibility to adequately develop the record. See Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991) (per curiam); Evangelista v. Secretary of Health and Human Servs., 826 F.2d 136, 142 (1st Cir. 1987). "Under-standably, this responsibility increases when the applicant is bereft of counsel." Evangelista, 826 F.2d at 142; see also Currier v. Secretary of Health, Education and Welfare, 612 F.2d 594, 598 (1st Cir. 1980). The ALJ also has a heightened

responsibility to assist a claimant in gathering evidence relating to the demands of her past relevant work.  See Heggarty,

947 F.2d at 997; <u>Carrillo Marin v. Secretary of Health and Human Servs.</u>, 758 F.2d 14, 17 (1st Cir. 1985) (per curiam). While an ALJ must develop a full and fair record of the claim, he or she does not act as counsel for a pro se claimant. <u>See</u> <u>Thompson v. Secretary of Health and Human Servs.</u>, 933 F.2d 581, 586 (7th Cir. 1991); <u>Smith v. Secretary of Health and Human Servs.</u>, 677 F.2d 826, 829 (11th Cir. 1982). Therefore, when an ALJ satisfies his heightened responsibility by making particular attempts to assist the claimant in obtaining counsel and developing the record, his decision must be upheld. <u>Evangelista</u>, 826 F.2d 142-43.

In this case, the record demonstrates that the ALJ elicited testimony from Zownir describing the requirements of her past work. <u>See</u> R. at 34-35. The ALJ also offered to postpone the hearing so that Zownir could obtain representation and he allowed her to review the evidence and update the record as needed. <u>See</u> R. at 28,30. Finally, the ALJ clearly explained to Zownir that if anything was missing from the record, he would help her to

obtain the missing evidence.[8]  In this case, Zownir has failed to

establish the sort of prejudice or unfairness attributable to

self-representation as would warrant remand.  See Evangelista,

826 F.2d at 143.  Accordingly, I conclude that the ALJ upheld his

duty to adequately develop the record.

**B.    The ALJ's Determination of Zownir's Mental Impairment as
       Non-Severe**

At step two of the sequential evaluation process, the ALJ

must determine if the individual has an impairment and if that

impairment is severe.  See 20 C.F.R. § 404.1520(c).  An

impairment is considered "severe" if it can be expected to result

in death or has lasted for at least twelve consecutive months and

significantly limits an individual's physical or mental ability

to perform basic work activities.  See id.  Basic work activities

---

[8]    At the conclusion of the hearing, the ALJ stated that
"since you opted not to have a representative, you review your
case once again, and if anything is missing, we will try to
develop it.  We will try to help you develop your case.  If
. . . you don't understand the word 'develop', I mean we will
send away for updated or for old medical evidence in order to get
a complete picture."  Zownir responded by stating "[e]verything
was updated.  I don't believe I can gather more evidence."
R. at 47.

include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling. See 20 C.F.R. § 404.1521(b) (1999). Nonexertional functions, such as the ability to hear, see, speak, understand, remember, carry out simple instructions, use judgment, respond appropriately in work-like conditions, and deal with changes in a routine work setting are also considered basic work activities. See id. A finding that an impairment is non-severe is justified when the impairment has only a minimal impact upon the claimant's ability to perform basic work activities. See McDonald v. Secretary of Health and Human Servs., 795 F.2d 1118, 1124-25 (1st Cir. 1986); 20 C.F.R. § 404.1521 (1999). If an ALJ finds at step 2 that a claimant's impairment or combination of impairments is non-severe, the claimant will not be considered disabled. See 20 C.F.R. § 404.1521(a); see also Goodermote, 690 F.2d at 6.

In the present case, the ALJ found that Zownir suffered from "a severe impairment of chronic dental and facial pain and discomfort of uncertain etiology." Although he also concluded

-23-

that Zownir suffered from a mental impairment of depression accompanied by paranoid delusional thoughts, he did not consider her mental impairment to be severe because after Zownir sought treatment and counseling for her mental impairment in March 1988, she "improved quite remarkably within two months as she had regained normal ability to sleep and eat and had no problems with low energy level." R. at 19. Accordingly, the ALJ concluded

that Zownir's impairment did not maintain the requisite level of severity for twelve consecutive months. Id. Zownir nevertheless argues that she met the durational requirement of the Act because she was in treatment with her psychiatrist, Dr. Edward Drummond, for more than twelve consecutive months. Zownir therefore suggests that the durational requirement applies only to her impairment rather than her inability to work as the result of the impairment.

The term "durational impairment" has been interpreted in several circuit courts of appeals. See Alexander v. Richardson, 451 F.2d 1185 (10th Cir. 1971); Titus v. Sullivan, 4 F.3d 590, 594 (8th Cir. 1993). In Alexander, the claimant argued that if his impairment extended for a period of one year or more, he was entitled to benefits even if his inability to engage in substantial gainful activity lasted only for a lesser period. Alexander, 451 F.2d at 1186. The Tenth Circuit held that the purpose of the statute and its legislative history support the Secretary's interpretation that it is the disability which must

be continuous for 12 months, rather than the impairment.  Id.  In

Titus, the court reasoned that:

> Disability is established by showing a medically
> determinable mental or physical impairment which
> prevents engaging in any gainful activity. Inability
> to engage in any gainful activity and the impairment
> which causes it cannot be separated. The two
> components of disability must exist at the same time.
> The statute, which defines disability, not impairment,
> speaks only of an impairment which can be expected to
> result in death or to last for a continuous period of
> at least twelve months and one which will disable a
> person seeking disability benefits for a like period.

Titus, 4 F.3d at 594. The court further "observed that although a person who has lost one hand has an impairment for life, he is not entitled to disability benefits if he is able to return to gainful activity within one year of his injury." Id.

I agree that in order for a claimant to meet the Act's durational requirement, she must demonstrate that she was unable to engage in substantial gainful activity due to her impairment for twelve consecutive months. I find no error in the ALJ's decision that Zownir's mental impairment was not severe because it did not meet the 12-month durational requirement.

C.   **The ALJ's Determination of Zownir's RFC and Ability to Perform Past Relevant Work**

Zownir claims that the ALJ did not properly determine her

ability to perform her past relevant work pursuant to SSR 82-62.[9] This ruling sets forth the procedures for determining a disability claimant's capacity to perform past relevant work. SSR 82-62 states that "[t]he claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work." SSR 82-62, 1982 WL 31386, at *3 (1982). "[N]ot only must the claimant lay the foundation as to what activities her former work entailed, but she must point out (unless obvious), so as to put in issue, how her functional incapacity [rendered] her unable to perform her former usual work." Santiago, 944 F.2d at 5.

---

[9] SSR 82-62 provides [in relevant part]: "Determination of the claimant's ability to do past relevant work requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc. on the requirements of the work as generally performed in the economy." SSR 82-62, 1982 WL 31386, at *3 (1982).

The ALJ must carefully analyze the individual's statements regarding which requirements of past work could no longer be performed during the relevant time period, including the reasons for her inability to meet those requirements. See SSR 82-62 1982 WL 31386, at *3 (1982).

While SSR 82-62 placed the initial burden on Zownir to demonstrate the demands of her past work, the ALJ also was required to elicit evidence on this point due to Zownir's pro se status. See Heggarty, 947 F.2d at 997 (citing Currier, 612 F.2d 598). As discussed previously, I find that the ALJ satisfied this responsibility.

The ALJ ultimately found that Zownir's past relevant work was in the field of technical research. See R. at 20. The ALJ also found that the demands upon Zownir in this vocational field were not highly exertional and consisted of activities including: giving seminars, supervising students in the laboratory, using a variety of equipment, writing scientific papers, designing and conducting experiments, attending professional lectures, and

studying professional literature.  See id.

In determining whether a claimant can return to her past relevant work, the ALJ must determine the claimant's RFC.  See 20 C.F.R. § 404.1546 (1999).  Once the ALJ identifies a claimant's RFC, he then uses that RFC to determine whether the claimant has the capacity to perform her past relevant work.[10]  See Manso-Pizarro v. Secretary of Health and Human Servs., 76 F.3d 15, 17 (1st Cir. 1996) (per curiam).

In determining a claimant's RFC, the ALJ is required to perform a "function-by-function" assessment of the claimant's ability to do work-related activities.  See SSR 96-8p, 1996 WL 374184, at *3 (1996); Ferraris v. Heckler, 728 F.2d 582, 586-87 (2d Cir. 1984).  Moreover, the ALJ must specify the evidentiary basis of his RFC determination.  See White v. Secretary of Health

_____

[10]  "Your impairment must prevent you from doing past relevant work.  If we cannot make a decision based on your current work activity or on medical facts alone, and you have a severe impairment, we then review your residual functional capacity [RFC] and the physical and mental demands of the work you have done in the past.  If you can still do this kind of work, we will find that you are not disabled."  20 C.F.R. 404.1520(e).

-30-

and Human Servs., 910 F.2d 64, 65 (2d Cir. 1990) (noting that failure to specify a basis for RFC conclusion is sufficient reason to vacate a decision of the Commissioner); SSR 96-8p, 1996 WL 374184, at *7. To comply with both of these requirements, the ALJ must "consider objective medical facts, diagnoses and medical opinions based on such facts, and subjective evidence of pain or disability testified to by claimant and others." Ferraris, 728 F.2d at 585; see also 20 C.F.R. § 404.1545(a) (1999) (RFC must be based upon all relevant evidence). In addition, "the ALJ is entitled to rely upon claimant's own description of the duties involved in her former job, as well as her own statements of her functional limitations." Santiago, 944 F.2d 1, at 5 (citing 20 C.F.R. § 404.1545(a)). During the hearing on March 25, 1997, the ALJ questioned Zownir about her past relevant work and her current ability to perform that work. The following colloquy took place:

> ALJ: So, what I'm interested in is your work from '82 to '87. That would be the relevant period. And you worked as a research assistant during that period?

ZOWNIR: Yes, research assistant (INAUDIBLE).

ALJ: What does a research assistant do?

ZOWNIR: In my case I was doing investigation on scientific projects.

ALJ: Go ahead.  What else?

ZOWNIR: Which mainly was laboratory work, doing genetic molecular experiments and molecule biology experiments.

ALJ: Okay.  Why did you stop doing that in 1987?

ZOWNIR: Because I was not able to perform my duties...I was very sick.  And my professor told me, if you don't resign, . . . I have to dismiss you.

ALJ: When you say you were very sick, I don't know what was wrong with you.  You have to tell me what was -- what do you mean by sick?

ZOWNIR: I could not concentrate.  I had, like, tension in my head and like a, electrical-like feeling in my mouth.  I had noise –

ALJ: What kind of feeling in your mouth?

ZOWNIR: Electrical like feeling in my mouth...and finally, I became generally ill.  I had chest pain.  I had numbness in my hands.  I was dizzy.  I was very weak.

R. at 35, 36.  Zownir also testified that her daily activities, between 1987 and 1989, included general housework and taking

-32-

English language classes.  See id. at 40.

Since the ALJ is a lay person, he is not qualified to "assess residual functional capacity based on a bare medical record."  Gordils v. Secretary of Health and Human Servs., 921 F.2d 327, 329 (1st Cir. 1990) (per curiam); see also Manso-Pizarro, 76 F.3d at 17 (observing that the record contained no analysis of functional capacity by physician or other expert); Berrios Lopez, 951 F.2d 427, 430 (1st Cir. 1991) (per curiam). In other words, if the medical evidence only documents the claimant's impairments but does not relate them to an exertional level, such as, light or sedentary work, then the ALJ may not make the connection himself.  Vital v. Shalala, Civ. A. No. 92-12695-MLW, 1994 WL 548051, at *7 (D. Mass. Aug. 11, 1994).

Dr. Burton A. Nault, medical consultant for the state Disability Determination Services ("DDS"), reviewed the medical evidence of record and rendered an assessment of Zownir's physical capabilities.  He concluded that Zownir retained a functional capacity for physical activity at the light exertional

level.  See R. at 120.  Dr. Nault also prepared a RFC narrative which discussed Zownir's condition for the period in question.[11]  In this narrative, Dr. Nault found that Zownir had a significant impairment due to facial pain syndrome but no "[l]istings level impairment or 12 months' total disability on a physical basis was identified."  Id.  Dr. Nault opined that Zownir retained the functional capacity to engage in light work.

In July 1996, psychologist, Udo Rauter, Ph. D., evaluated Zownir's medical and psychological evidence, specifically focusing on the period from her alleged onset date of October 1987 and the date of her last insured status of December 31, 1988.  See id. at 130.  Dr. Rauter determined that Zownir had an affective disorder of major depression with psychotic features which stabilized within five months and was reduced to "non-

_____

[11]  As discussed earlier, see (supra note 1), Zownir was last insured as of December 31, 1992.  Even though Dr. Nault states that his RFC analysis was for a time period from September 1, 1987 to December 31, 1988, it goes beyond the earlier date of December 1988, and takes into consideration medical evidence extending into December 1991.

severe" by December 31, 1988.  Id.

Based on the medical record and Zownir's testimony, the ALJ found that Zownir retained the mental alertness and ability to "understand, remember and carry out instructions; to use judgment; to respond appropriately to supervisors and to deal with changes in the work setting." Id. at 20.  The ALJ also found that "[n]either Dr. Drummond nor any other treating or examining physician found such [disabling] pathology for the requisite durational period." R. at 20. The ALJ concluded that there was no evidence of physical or mental limitations preventing Zownir from continuing her past work activities. See id. Zownir claims that the ALJ's RFC and past relevant work determinations were not based on substantial evidence.  The record is extensive and it is apparent that all of the relevant evidence was before the ALJ.  Zownir, now represented by counsel, has not been able to identify any gaps in the evidentiary record that has prejudiced her claim.  There is no indication that the ALJ failed to consider and weigh the full range of evidence

relevant to Zownir's alleged mental and physical impairments. The ALJ specifically found, for example, that since Zownir continues to read professional journals, "she is actually performing part of her prior work already." Id. at 21. The record contains medical records from the many treating physicians Zownir visited between 1984 through December 31, 1992 and beyond. The ALJ's decision reflects his consideration of this evidence pursuant to his obligation under SSA regulation 20 C.F.R § 404.1527(d)(2) (1999). See Rodriquez v. Secretary of Health and Human Servs., 915 F.2d 1557, No. 90-1039, 1990 WL 152336, at *1 (1st Cir. Sept. 11, 1990) (per curiam) ("An ALJ is not required to expressly refer to each document in the record, piece-by-piece. He or she may summarize the medical findings reported there.").

The ALJ sufficiently summarized the relevant medical evidence and testimony from Zownir to substantiate his final determinations of Zownir's RFC and ability to return to past relevant work. Therefore, the ALJ's RFC and past relevant work

determinations were based on substantial evidence.

**D.   Zownir's Subjective Complaints of Pain**

Finally, Zownir argues that the ALJ failed to adequately consider her subjective complaints of pain.  I disagree.  The SSA Commission's regulations require that a claimant's symptoms, including complaints of pain, be considered when determining whether a claimant is disabled.[12]  An ALJ must follow a two-step process to evaluate a claimant's subjective complaints of pain. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment which can reasonably be expected to produce the pain alleged.  See 20 C.F.R. § 404.1529(b) (1999); Da Rosa v. Secretary of Health and Human Servs., 803 F.2d 24, 25 (1st Cir. 1986) (per curiam).  Then, if such an impairment exists, the ALJ must evaluate "the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [the claimant's] symptoms limit [his or her]

---

[12]   Pain can constitute either an independent and separate basis for disability or a nonexertional factor to be considered in conjunction with exertional limitations.  See Gagnon v. Secretary of Health and Human Servs., 666 F.2d 662, 666 n.8 (1st Cir. 1981).

-38-

capacity for work." 20 C.F.R. § 404.1529(c)(1) (1999). At this stage, the ALJ considers "all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements from [the claimant], [the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." Id.

The Commissioner recognizes that symptoms such as pain may suggest a more severe impairment "than can be shown by objective medical evidence." 20 C.F.R. § 404.1529(c)(3). Accordingly, the ALJ is directed to evaluate claimant's complaints of pain, in light of the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate her pain; (5) treatment, other than medication, the claimant receives or has received for relief of her pain; (6) any measures

the claimant uses or has used to relieve pain; and (7) any other factors concerning the claimant's limitations and restrictions due to pain.  Id.; Avery v. Secretary of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986).  In addition to considering

these factors, the ALJ is entitled to observe the claimant, evaluate her demeanor, and consider how the claimant's testimony fits with the rest of the evidence. See Frustaglia v. Secretary of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (per curiam).

In assessing the credibility of a claimant's subjective complaints of pain, the ALJ must examine whether these complaints are consistent with the objective medical evidence and other evidence in the record. See 20 C.F.R. § 1529(a) (1999). A claimant's complaints of pain do not have to be precisely corroborated with the objective medical evidence; such evidence only needs to be consistent with the claimant's complaints. See Dupuis v. Secretary of Health and Human Servs., 869 F.2d 622, 623 (1st Cir. 1989) (per curiam).

In this case, the ALJ specifically found that Zownir's allegations of severe and disabling pain were not supported by either the objective medical evidence or the information Zownir supplied concerning her daily activities. See R. at 22.

Further, the medical evidence in the record supports the ALJ's determination that Zownir's pain did not limit her functional capacity beyond that already assessed. The medical evidence is entirely inconsistent with Zownir's complaints of debilitating pain. The many physicians who examined Zownir prior to her alleged onset date all concluded that the medical evidence was inconsistent with Zownir's complaints of debilitating pain. For example, on August 24, 1987, Dr. Huggins concluded that Zownir was not mechanically injured and was able to work in a different area of the same vocational field. See id. at 324. On October 31, 1987, Drs. Onstad and Salvo both stated that Zownir's oral facial pain was not clinically consistent with what she described subjectively and suggested psychiatric treatment. See id. at 214.

Between 1986 and March 1988, Zownir was evaluated by three psychiatrists. She refused to take any of their treatment advice. As the record indicates, it was not until March 29, 1988, that Zownir finally sought psychiatric counseling and

treatment.  Within eight months of beginning treatment, Zownir had remarkably improved.  See id. at 229-30; 235-46.

There is also substantial evidence in the record to support the ALJ's determination that Zownir's daily activities were inconsistent with the degree of pain she alleged.  See Roe v. Chater, 92 F.3d 672, 677 (8th Cir. 1996) ("More telling than a chronicle of [the claimant's] various ailments are [her] actual activities, which are incongruous with [her] contention that [she] cannot work."); see also Cruze v. Chater, 85 F.3d 1320, 1324 (8th Cir. 1996) (the ALJ properly disregarded social security disability claimant's subjective complaints of pain and light-headedness, where they conflicted with evidence concerning claimant's daily activities).  As in Cruze, the ALJ in this case concluded that Zownir's complaints lacked credibility because they were inconsistent with her "full schedule of social; cultural and personal activities."  R. at 21.[13]

---

[13]    In support of this conclusion, the ALJ found the following:

The claimant reports that she cleans house, cooks, shops,

Zownir alleges that the ALJ did not properly evaluate her

subjective complaints of pain, lack of concentration, and

fatigue. It is true that the ALJ's decision does not provide

express and specific findings for each factor set forth in the

applicable regulations and case law. Notwithstanding this lack

of specificity, I conclude that the ALJ's adverse credibility

determination is supported by substantial evidence of Zownir's

daily activities, her refusal to seek treatment and all of the

medical evidence. See Frustaglia, 829 F.2d at 195 ("Although

> does laundry, reads, writes, goes for walks, listens to
> music, gardens, attends the theatre and concerts, goes to
> museums, restores furniture, goes to picnics, watches
> television, skis, visits family and friends, and drives.
> Despite these reports, however, she asserts that she has to
> avoid stressful situations and try to be relaxed in order to
> relieve her discomfort. This assertion finds no
> corroboration in objective evidence and is not given
> credibility.
>
> The claimant's other assertions of functional limitations so
> severe that they are disabling are lacking in credibility;
> for example, she maintains that some days she has to stay in
> bed because of her discomfort. I find it unreasonable to
> believe that she could maintain she is bedridden by her
> complaints because she has not reported this to physicians
> and because she reports an active schedule which doesn't
> really allow time to stay in bed all day. See R. at 21.

more express findings, regarding head pain and credibility, than those given here are preferable, we have examined the entire record and their adequacy is supported by substantial evidence.").

## IV. <u>CONCLUSION</u>

Because I have determined that the Commissioner's conclusion that Zownir was "not disabled" during the period of her eligibility for disability benefits from January 11, 1987, until December 31, 1992, is supported by substantial evidence, I affirm. Accordingly, Zownir's motion to reverse and remand (Doc. No. 5) is denied, and defendant's motion for an order affirming Commissioner (Doc. No. 7) is granted. The clerk shall enter judgment accordingly.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

March 29, 2000

cc:  Raymond J. Kelly, Esq.
     David L. Broderick, Esq.