Wright v. SSA                          CV-00-27-B      10/13/00

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


**ROBERT F. WRIGHT**


    **v.**                                    Civil No. 00-027-B
                                       Opinion No. 2000 DNH 213

**KENNETH S. APFEL, Commissioner,**
**Social Security Administration**



**MEMORANDUM AND ORDER**

Robert F. Wright applied for Title II Social Security period of disability and disability insurance benefits on June 12, 1997, alleging an inability to work since August 23, 1996.[1]  After the Social Security Administration ("SSA") denied Wright's application, initially and upon reconsideration, Wright requested a hearing before an Administrative Law Judge ("ALJ").  ALJ Robert S. Klingebiel held a hearing on Wright's claim on April 14, 1998.  In a decision dated July 20, 1998, the ALJ found that Wright was

_____

[1]  Wright's coverage allows him to remain insured through December 31, 2001.  See Tr. at 24.  ("Tr." refers to the certified transcript of the record submitted to the Court by the SSA in connection with this case.)

"not disabled" because, although he was unable to return to his previous employment, Wright remained able to perform other work available in the national economy. On December 6, 1999, the Appeals Council denied Wright's request for review, rendering the ALJ's decision the final decision of the Commissioner of the SSA.

Wright brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (1994), seeking review of the denial of his claim for benefits. For the reasons set forth below, I conclude that the ALJ's decision that Wright was not entitled to benefits is supported by substantial evidence. Therefore, I affirm the Commissioner's decision and deny Wright's motion to reverse.

## I. **FACTS**[2]

Robert F. Wright was 49 years old when he applied for benefits. He graduated from high school and also received an Associate Degree in aviation science. See Tr. at 41. Wright

---

[2] Unless otherwise noted, the following facts are taken from the Joint Statement of Material Facts (Doc. #9) submitted by the parties.

worked as a jig grinder from 1977 until August 23, 1996. See id. at 99. He has not worked since August 23, 1996, the date he claims his disability began.

Wright's respiratory and sinus symptoms began with a cough in March 1996. See Tr. at 172. On May 12, 1996, the attending doctor at Exeter Hospital treated Wright's persistent cough and resulting wheeze with steroids, bronchodilators, and antibiotics. See id. at 170-73. He diagnosed Wright with asthma and mild bronchospasm. See id. at 171-72. Wright's initial symptoms persisted and his family physician, Dr. Susan Therriault, affirmed the bronchospasm and asthma diagnoses on June 4, 1996. See id. at 363.

Wright, upon a referral from Dr. Therriault, underwent a pulmonary function test on June 20, 1996. See id. at 197. The findings of the test indicated "moderate obstructive lung disease with some air trapping and minimal reversibility." Id.

The following day, Dr. Hilton Lewinsohn examined Wright at the Center for Asthma, Allergy & Respiratory Disease. He

described Wright as a sick patient with a chronic cough, whose clinical findings are consistent with either bronchitis or asthma. Under Dr. Lewinsohn's care, Wright's cough and shortness of breath improved with the use of bronchodilators and steroids and as a result of Wright's not returning to work for a few weeks.

On July 15, 1996, Wright returned to work after his employer furnished him with a respirator and exhaust ventilation system. The respirator and ventilation system, however, did not help to relieve his symptoms. In August 1996, Wright was still experiencing trouble breathing. On August 21, 1996, Dr. Lewinsohn diagnosed Wright with occupational asthma, due to hard metal exposure, and chronic mucoid rhinorrhea.[3] Dr. Lewinsohn told Wright to continue with his treatment regimen that included Albuterol, Aerobid-M, and Nasacort.

In October 1996, Dr. D'Angelo diagnosed Wright with a deviated septum, chronic sinusitis with nasal obstruction, and

---

[3] Rhinorrhea is the discharge from the nasal mucous membrane. Stedman's Medical Dictionary 1359 (25th ed. 1990).

-4-

chronic bronchitis.  On October 30, 1996, Dr. D'Angelo performed a septoplasty[4] and sinus endoscopy to correct his deviated septum and alleviate his sinus symptoms.  During the operation Dr. D'Angelo observed abnormal polypoid[5] changes in the sinus cavity.

In the months following the operation, Wright's asthmatic condition waxed and waned, although his chest symptoms stabilized.  Wright, however, continued to suffer from chronic sinus infections and associated discomfort.  As a result, on January 15, 1997, Dr. Lewinsohn referred Wright to Dr. Bruce Suzuki, an ear, nose, and throat specialist.

From January to September 1997, Dr. Suzuki treated Wright for pansinusitis,[6] postnasal drainage, probable allergic

---

[4]  A septoplasty is an operation to correct defects of the nasal septum.  Stedman's Medical Dictionary 1405 (25th ed. 1990).

[5]  A polypoid has three or more of the haploid number of chromosomes.  Stedman's Medical Dictionary 1238 (25th ed. 1990).

[6]  Pansinusitis consists of the inflammation of all the accessory sinuses of the nose on one or both sides.  Stedman's Medical Dictionary 1127 (25th ed. 1990).

rhinitis,[7] and early polypoid changes.  A January 1997 CT scan revealed acute superimposed upon chronic sinusitis with variable rates of mucosal thickening in the various sinus cavities.  The scan also showed that the ethmoid air cells were almost completely opacified bilaterally.

On January 28, 1997, Wright returned to Exeter Hospital complaining of shortness of breath.  The attending physician diagnosed Wright with reactive airway disease and told him to continue taking his regular medication.  See Tr. at 190.

Dr. Suzuki performed Wright's second sinus surgery on February 3, 1997, to alleviate symptoms related to his persistent sinusitis and asthma, both of which remained "unresponsive to medical treatment."  Dr. Suzuki's operative note commented that after Wright's October 1996 septoplasty, Wright continued to have a problem with "pansinusitis with purulent discharge, facial pain, and exacerbated asthma secondary to purulent postnasal discharge."  Tr. at 292.

---

[7]  Rhinitis is the inflammation of the nasal mucous membrane.  Stedman's Medical Dictionary 1358 (25th ed. 1990).

-6-

Another specialist, Dr. Gary Epler, examined Wright on March 4, 1997, and Wright underwent pulmonary function tests as part of the examination.  Dr. Epler's report diagnosed Wright with asthma and possible constrictive bronchiolitis.  Dr. Epler also noted that Wright would not be able to return to work as a jig grinder because of his inflamed airways and recommended that Wright work in an "environment where irritant levels of dust, fume, or mist exposure will not occur."  Tr. at 301.  A chest CT scan at that time revealed the presence of bullous emphysema and pleural plaques that were probably the result of asbestos exposure.

On April 2, 1997, Wright underwent revision functional endoscopic sinus surgery of the maxillary and ethmoid sinuses, performed by Dr. Suzuki.  The operative report indicated the presence of polypoid disease in some of the ethmoid air cells. See Tr. at 305.

Dr. Lewinsohn's treatment notes from June 1997 through September 1997 indicated that Wright's respiratory symptoms remained stable after this third sinus surgery.  The notes,

however, revealed that Wright continued to suffer from chronic sinus infections and discomfort associated with those infections.

Dr. Lewinsohn interpreted Wright's pulmonary function tests, performed in May and June 1997, as normal. The May 1997 test revealed findings "comparable with the [diagnosis] of bronchiolitis obliterans but not confirmatory of airways obstruction or asthma." Tr. at 203. A June 1997 CT scan revealed emphysematous blebs.[8] See id. at 277.

Dr. Suzuki, on October 6, 1997, reported that Wright's chronic sinusitis and respiratory problems are related to his work place environment. See id. at 321. He noted that these problems "will persist throughout the rest of [Wright's] life due to their chronicity and [his] prior exposure to chemicals" and that "it would be best if he could avoid being exposed to further chemical exposure as this would have a progressive deleterious effect." Id. at 321-22. A CT scan of the sinuses, dated October 22, 1997, exhibited Wright's sinus disease.

---

[8] A bleb is a large flaccid vesicle. Stedman's Medical Dictionary 193 (25th ed. 1990).

Dr. Lewinsohn noted that in December 1997 and January 1998, Wright complained mainly of sinus problems that abated only after Dr. Suzuki performed wash outs or through the use of antibiotics. At that time, his asthmatic symptoms appeared to have stabilized. See Tr. at 337. Dr. Lewinsohn also stated that the only drawback to Wright's entering a vocational rehabilitation plan was that his current sinus treatments could result in some days when Wright could not attend classes, depending upon when the classes started.

Wright's treatment regimen for his sinus symptoms also included another revision functional endoscopic sinus procedure in March 1998 that disclosed further polypoid disease. At that time, Dr. Suzuki noted that although Wright's symptoms appeared to be somewhat improved, he felt that Wright should not return to his previous workplace. See Tr. at 347.

A few weeks after Wright's sinus surgery, Dr. Lewinsohn furnished an Assessment of Ability to do Work-Related Activities. Dr. Lewinsohn concluded that Wright's symptoms did not affect his

lifting, carrying, standing, and sitting capacity.  Wright's symptoms also did not affect his physical functions.  His asthmatic symptoms, however, occasionally affected his ability to climb.  The assessment also reported several environmental restrictions necessitated by his symptoms.

Dr. Lewinsohn's findings echoed those of Dr. Hugh Fairley, a non-examining state agency medical consultant, who assessed Wright's residual functional capacity ("RFC") a few months earlier.  On August 12, 1997, Dr. Fairley determined that Wright had the capacity to occasionally lift and carry up to twenty pounds; to frequently lift and carry up to ten pounds; to be able to stand and/or walk and sit for up to six hours in a day with normal breaks; and to have an unlimited capacity to push and pull.  Dr. Fairley also found that Wright had no postural, visual, or communicative limitations, but he noted Wright's environmental limitations for exposure to fumes, odors, dusts, gases and poor ventilation.  Dr. Burton Nault reviewed the record and, on November 5, 1997, affirmed Dr. Fairley's RFC assessment

as written.  The doctors concluded that Wright is capable of performing light work in a setting that complies with his environmental limitations.  See Tr. at 319.


## II. STANDARD OF REVIEW

After a final determination by the Commissioner denying a claimant's application for benefits, and upon timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the ALJ's decision.  See 42 U.S.C. § 405(g) (1994).  My review is limited in scope, however, as the ALJ's factual findings are conclusive if they are supported by substantial evidence.  See id.; Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam). The ALJ is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicts in the evidence.  See Irlanda Ortiz, 955 F.2d at 769.  Therefore, I

must "uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion." Id. (quoting Rodriguez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)) (internal quotation marks omitted).

While the ALJ's findings of fact are conclusive when supported by substantial evidence, they "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to the experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). I apply these standards in reviewing the issues that Wright raises on appeal.

### III. DISCUSSION

The Social Security Act (the "Act") defines "disability" for the purposes of Title II as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months." 42 U.S.C. §
423(d)(1)(A) (1994). The Act directs an ALJ to apply a five-step
sequential analysis to determine whether a claimant is disabled.[9]
See 20 C.F.R. § 404.1520 (2000). At step four of the process,
the ALJ must determine whether the claimant's impairment prevents
him from performing his past work. See id. § 404.1520(e). To
make this determination, the ALJ must assess both the claimant's
residual functional capacity ("RFC"), that is, what the claimant
can do despite his impairments, and the demands of the claimant's
prior employment. See id.; 20 C.F.R. § 404.1545(a); see also
Santiago v. Secretary of Health and Human Servs., 944 F.2d 1, 7
(1st Cir. 1991) (per curiam). The claimant bears the burden of
showing that he does not have the RFC to perform his past
relevant work. See Santiago, 944 F.2d at 5.

---

[9] In applying the five-step sequential analysis, the ALJ is
required to determine: (1) whether the claimant is presently
engaged in substantial gainful activity; (2) whether the claimant
has a severe impairment; (3) whether the impairment meets or
equals a listed impairment; (4) whether the impairment prevents
or prevented the claimant from performing past relevant work; and
(5) whether the impairment prevents or prevented the claimant
from doing any other work. See 20 C.F.R. § 404.1520 (2000).

-13-

At step five, the burden shifts to the Commissioner to show "that there are jobs in the national economy that [the] claimant can perform." Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991) (per curiam); see also Keating v. Secretary of Health and Human Servs., 848 F.2d 271, 276 (1st Cir. 1988) (per curiam). The Commissioner must show that the claimant's limitations do not prevent him from engaging in substantial gainful work, but need not show that the claimant could actually find a job. See Keating, 848 F.2d at 276 ("The standard is not employability, but capacity to do the job.").

In the present case, the ALJ concluded at step five of the sequential evaluation process that Wright was "not disabled." See Tr. at 25, 29, 30. The ALJ determined that Wright lacks the RFC to work in an area where exposure to environmental irritants, temperature extremes, dust, or fumes is likely. See id. at 29. The ALJ concluded that these non-exertional limitations preclude Wright's return to his former employment. See id. Ultimately, the ALJ considered Wright's educational background, age, RFC, and

the testimony of the vocational expert in deciding that Wright can perform light and sedentary work[10] that exists in significant numbers in the national economy.  <u>See</u> <u>id.</u> at 29, 55-56.

Wright makes multiple arguments in support of his motion to reverse the ALJ's decision.  First, Wright asserts that the ALJ improperly calculated Wright's residual functional capacity because: 1) the ALJ did not properly evaluate Wright's subjective complaints of pain; 2) the ALJ ignored certain medical evidence that was relevant to his residual functional capacity including his treatment regimen and side effects from his medication; and 3) the ALJ failed to give the appropriate weight to the opinions submitted by examining physicians.  Second, Wright argues that the ALJ improperly relied on the testimony of the vocational

_____

[10]  Light work may involve "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," "a good deal of walking or standing," and/or "sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b) (2000).  "If someone can do light work, . . . [he ordinarily] can also do sedentary work . . . ."  <u>Id.</u>  Sedentary work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;" occasional "walking and standing;" and frequent "sitting."  <u>Id.</u> § 404.1567(a).

-15-

expert because the hypothetical question posed did not fully reflect Wright's functional limitations. I address each of these arguments in turn.

## A. **Wright's Subjective Complaints of Pain**

Wright argues that the ALJ failed to give adequate consideration to his subjective complaints of pain, and other symptoms, because the ALJ did not consider all the record evidence in making his credibility determination. Although Wright does not expressly make this argument, he seems to contend that his pain and other symptoms should be treated as non-exertional limitations in his RFC assessment. For the following reasons, I disagree.

### 1. Standards Governing an ALJ's Credibility Determination

The SSA regulations require that a claimant's symptoms, including complaints of pain, be considered when determining whether a claimant is disabled. See 20 C.F.R. § 404.1529(a) (2000). An ALJ must follow a two-step process to evaluate a claimant's subjective complaints of pain. First, the ALJ must

determine whether the claimant suffers from a medically determinable impairment that can reasonably be expected to produce the pain and other symptoms alleged.  See id. § 404.1529(b); Da Rosa v. Secretary of Health and Human Servs., 803 F.2d 24, 25 (1st Cir. 1986) (per curiam).  Then, if such an impairment exists, the ALJ must evaluate the intensity, persistence, and functionally limiting effects of the claimant's symptoms so that the ALJ can determine how the claimant's symptoms limit his or her capacity for work.  See 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186, at *1 (1996).  At this stage, the ALJ must consider "all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements from [the claimant], [the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]."  20 C.F.R. § 404.1529(c)(1).

The Commissioner recognizes that symptoms such as pain may suggest a more severe impairment "than can be shown by objective

medical evidence alone."  Id. § 404.1529(c)(3).  Accordingly, the ALJ must evaluate the claimant's complaints of pain in light of the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate his pain; (5) treatment, other than medication, the claimant receives or has received for relief of his pain; (6) any measures the claimant uses or has used to relieve pain; and (7) other factors concerning the claimant's limitations and restrictions due to pain.  See id.; see also Avery v. Secretary of Health and Human Servs., 797 F.2d 19, 29-30 (1st Cir. 1986).  These factors are sometimes called the "Avery factors."  In addition to considering these factors, the ALJ is entitled to observe the claimant, evaluate his demeanor, and consider how the claimant's testimony fits with the rest of the evidence.  See Frustaglia v. Secretary

of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987)

(per curiam).

In assessing the credibility of a claimant's subjective

complaints of pain, the ALJ must consider whether these

complaints are consistent with the objective medical evidence and

other evidence in the record.  See 20 C.F.R. § 404.1529(a).

While a claimant's complaints of pain must be consistent with the

medical evidence to be credited, they need not be precisely

corroborated with such evidence.  See Dupuis v. Secretary of

Health and Human Servs., 869 F.2d 622, 623 (1st Cir. 1989) (per

curiam).  The ALJ in making a credibility determination must also

make specific findings as to the relevant evidence he considered

in deciding whether to believe a claimant's subjective

complaints.  Da Rosa, 803 F.2d at 26.

If the ALJ believes a claimant's testimony about his pain

and other symptoms, the ALJ may consider the pain as a non-

exertional limitation.  See Frustaglia, 829 F.2d at 195; Da Rosa,

803 F.2d at 26-27.  The ALJ must then consider this non-

exertional limitation in determining a claimant's RFC.  See id.

2.   The ALJ's Assessment of Wright's Subjective
     Complaints of Pain

In this case, the ALJ made a specific finding regarding the first step of the pain assessment process.  See 20 C.F.R. § 404.1529(b).  He determined that Wright suffered from "underlying medically determinable impairment[s]," including emphysema, asthma, sinusitis, and bronchiolitis obliterans, "that could reasonably cause the pain and other symptoms alleged."  Tr. at 25.

Wright concedes that his subjective complaints of pain, and other symptoms, are not fully supported by the medical evidence in the record, but he nevertheless argues that the ALJ erred in failing to consider the "Avery factors" in assessing his complaints of pain.  See Pl's Mot. to Reverse and Remand (Doc. No. 7) at 2.  Contrary to Wright's argument, there is substantial evidence that the ALJ considered all of the record evidence, including the Avery factors, in evaluating the intensity and persistence of Wright's symptoms of headaches, fatigue, and

shortness of breath.

The ALJ's ample questioning of Wright that focused on the Avery factors indicates that the ALJ considered those factors in his credibility determination. See Frustaglia, 829 F.2d at 195 (questioning about the Avery factors was one ground among others for finding that a credibility determination was supported by substantial evidence). The ALJ questioned Wright extensively about his daily activities, extracting details about his activities on a "typical day" and a "bad day." Tr. at 45-51. The ALJ also elicited information about the duration, frequency, and intensity of Wright's pain and other symptoms by asking how often he has good and bad days, whether the bad days are consecutive, and whether he is "completely knock[ed] out" on the bad days. Id. at 47, 48.

The ALJ also questioned Wright about any precipitating and aggravating factors such as weather, fumes, and anything in Wright's control that might bring about the bad days. See id. at 46, 49. The ALJ further questioned Wright about the medications

he takes to deal with his headaches and why he does not take stronger medications. See id. at 50. Furthermore, the ALJ also elicited information about other measures Wright uses or has used to relieve his pain, such as lying down and sleeping. See id. at 47, 49.

In order to assess the credibility of Wright's complaints of pain and other symptoms, the ALJ had to consider whether the complaints, in light of the Avery factors, were consistent with the objective medical evidence and other evidence in the record. 20 C.F.R. § 404.1529(a). The ALJ, in his decision, referred to Wright's headaches and trouble breathing, but found that the objective medical evidence did not support a finding of severity sufficient to preclude Wright from performing all work. See Tr. at 26. He found that there was no evidence of other restrictions or limitations on Wright's ability to work and that Wright's testimony did not suggest other constraints. See id. Therefore, the ALJ found that Wright's subjective complaints "are not entirely credible in light of discrepancies between [Wright's]

assertions and information contained in the documentary reports."
Id. at 26-27, 29.

Although I am concerned by the limited findings provided by the ALJ to support his credibility determination, I conclude that substantial evidence supports the ALJ's adverse credibility determination. See Frustaglia, 829 F.2d at 195 ("Although more express findings, regarding head pain and credibility, than those given here are preferable, we have examined the entire record and their adequacy is supported by substantial evidence.").

The medical evidence in the record supports the ALJ's finding that Wright's symptoms are not severe enough to limit his functional capacity beyond that already assessed. At the time of the hearing, Wright's asthmatic symptoms had stabilized and were not causing him any discomfort. See Tr. at 337, 339, 362. Wright did, however, complain to Dr. Lewinsohn on multiple occasions about having sinus headaches, sinus pressure, and fatigue. See id. at 337, 339, 360, 361. The fact that Wright's CT scans diagnosed his acute superimposed upon chronic sinusitis

and the fact that he underwent multiple surgeries to alleviate his sinus pain, appear to support the intensity of Wright's chronic sinusitis symptoms.  See id. at 186, 291, 292, 305, 340, 347.  Even where the record could support another conclusion, however, the ALJ's decision must be upheld if there was substantial evidence to support it.  See Rodriguez Pagan v. Secretary of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

The record provides little medical evidence supporting the idea that Wright's symptoms are severe enough to preclude Wright from engaging in all types of work.  In a report dated October 6, 1997, Dr. Suzuki stated that Wright's sinuses would never retain normality, however, he further noted that Wright's asthma-related problems are what prevents him from returning to work.  See Tr. at 321.  Therefore, Dr. Suzuki concluded that Wright should avoid further chemical exposure in the workplace.  See id.  A few weeks prior to the ALJ hearing, Dr. Suzuki reported that, after a recent sinus procedure, Wright's sinus symptoms appeared to be

improving.  See id. at 347.  Dr. Suzuki again reiterated that Wright should not work in an environment where he might be exposed to chemicals, however, he did not mention any other work-related limitations stemming from Wright's sinus condition.  See id.

Dr. Lewinsohn's Medical Assessment of Ability to do Work-Related Activities in March 1998 also reported environmental restrictions on Wright's ability to work.  See Tr. at 324-32. Dr. Lewinsohn, however, did not comment on any limitations imposed by Wright's sinus condition.  See Pl's Mot. to Reverse and Remand (Doc. No. 7) at 22.  The Physical Residual Functional Capacity Assessment reported by Dr. Nault and Dr. Fairley on November 5, 1997, noted the same conclusion that Wright's only limitation related to exposure to fumes, odors, gases, etc.  See Tr. at 312-19.  The fact that multiple doctors failed to comment on any limitation imposed by Wright's sinus condition suggests that Wright's subjective complaints are inconsistent with the medical evidence.

-25-

Wright's own testimony, specifically the information relating to the Avery factors, also supports the ALJ's decision that Wright's symptoms are not severe enough to suggest any new physical limitations on his ability to work. Wright complained that five days out of a month he cannot do anything except lay down and sleep, and on ten days per month he has to push himself to engage in daily activities. See Tr. at 46. Based on his testimony, however, it appears that Wright can engage in daily activities on almost twenty-five days per month. See id. at 44-51. On many of these days he can go for a walk and clean up around the house. See id. at 45. Furthermore, Wright claims that he would like to return to work, and Dr. Lewinsohn feels that Wright is capable of beginning a vocational rehabilitation plan. See id. at 51, 362.

The record also indicates that on many days Wright took only nonprescription medications to deal with his pain. See id. at 50. He relied on Advil to alleviate his sinus headaches claiming that other medications made him drowsy. See id. The ALJ is

entitled to find that the non-use of stronger pain medications shows an inconsistency with the severity of the pain Wright alleged.  See Albors v. Secretary of Health and Human Servs., 817 F.2d 146, 147 (1st Cir. 1986) (per curiam) ("[An RFC assessment], together with the fact that claimant apparently takes nothing stronger than aspirin, supports the ALJ's rejection of claimant's assertions of disabling pain.").

It remains the obligation, however, of the ALJ to decide issues of credibility and to draw necessary inferences from the record.  See Irlanda Ortiz, 955 F.2d at 769.  The objective medical evidence, along with the information relating to the Avery factors, supports the ALJ's finding that Wright's pain and other symptoms are not severe enough to further limit his ability to work.  Therefore, I conclude that the ALJ's determination that Wright's subjective complaints of pain were not entirely credible is supported by substantial evidence and thus entitled to deference.  See Frustaglia, 829 F.2d at 195.  Because the ALJ could discredit Wright's testimony about his symptoms and any

limitations imposed by those symptoms, the ALJ did not need to consider the sinus headaches, fatigue, and shortness of breath as non-exertional impairments in determining Wright's RFC. See id.

## B.    The ALJ's RFC Determination

### 1.    Standards Governing an RFC Determination

An RFC determination specifies what a claimant is able to do despite his limitations. See 20 C.F.R. § 404.1545(a)(2000). The ALJ is responsible for determining a claimant's RFC. See id. § 404.1546. The ALJ uses a claimant's RFC as the basis for deciding what types of work a claimant can perform in spite of his impairments. See id. § 404.1545(a).

In determining a claimant's RFC, an ALJ must perform a "function-by-function" assessment of the claimant's ability to engage in work-related activities. See SSR 96-8p, 1996 WL 374184, at *3 (1996); see also Ferraris v. Heckler, 728 F.2d 582, 586-87 (2d Cir. 1984)(holding that the ALJ's findings on claimant's RFC were insufficient where the ALJ determined claimant's RFC in a conclusory manner without a function-by-

function assessment). Moreover, the ALJ must specify the evidentiary basis for his RFC determination. See White v. Secretary of Health and Human Servs., 910 F.2d 64, 65 (2d Cir. 1990) (noting that the failure to specify a basis for the RFC conclusion is a sufficient reason to vacate a decision of the Commissioner); SSR 96-8p, 1996 WL 374184, at *7. When making his RFC determination, an ALJ must "consider objective medical facts, diagnoses and medical opinions based on such facts, and subjective evidence of pain or disability testified to by the claimant or others." Ferraris, 728 F.2d at 585; see 20 C.F.R. § 404.1545(a) (stating that the RFC must be based on all relevant evidence).

Because an ALJ is a lay person, however, he "is not qualified to assess residual functional capacity based on a bare medical record." Gordils v. Secretary of Health and Human Servs., 921 F.2d 327, 329 (1st Cir. 1990) (per curiam). This means that if the medical evidence only describes the claimant's impairments but does not relate those impairments to an

exertional level, such as light work, the ALJ may not make that connection himself.  See Gordils, 921 F.2d at 329; Rosado v. Secretary of Health and Human Servs., 807 F.2d 292, 293 (1st Cir. 1986).  In these situations, an expert's RFC evaluation is "ordinarily essential . . . ." Manso-Pizarro v. Secretary of Health and Human Servs., 76 F.3d 15, 17 (1st Cir. 1996) (per curiam).

2.    The ALJ's Determination of Wright's RFC

In the present case, the ALJ determined at step four of the sequential evaluation process that Wright retained the RFC to perform a full range of work, with the exception that Wright could not work in an area where exposure to environmental irritants, temperature extremes, dust, or fumes was possible. See Tr. at 27, 29, 55-56.  In support of his decision, the ALJ provided the following function-by-function assessment:

> The file supports a finding that Mr. Wright has a lung
> disorder which prohibits him from being exposed to
> temperature extremes, chemicals, dust and fumes . . . .
> There is no evidence of other limitations or restric-
> tions.  The claimant did not testify to any physical
> limitations . . . .  Nonetheless, the undersigned finds

that the claimant has non-exertional limitations which interfere with his ability to work. The evidence supports a finding that he is not able to work in exposure to environmental irritants, temperature extremes or dust or fumes.

Id. at 26-27. Although a more specific function-by-function analysis is desirable, the ALJ's RFC assessment accords with the assessments offered by the state's doctors and one of Wright's treating doctors. See id. at 313-19, 324-27. Therefore, I conclude that the ALJ's RFC assessment was supported by substantial evidence. See Gordils, 921 F.2d at 329 (concluding that an RFC assessment by a non-examining physician along with other findings from a treating doctor, not in the form of an RFC assessment, constituted substantial evidence to support the Secretary's RFC determination).

The state physicians concluded that Wright was able to occasionally lift and carry up to twenty pounds; to frequently lift and carry up to ten pounds; to stand and/or walk and sit for up to six hours in a day with normal breaks; and to have an

unlimited capacity to push and pull. See Tr. at 313. Dr. Fairley and Dr. Nault also found no postural, visual or communicative limitations, but noted environmental limitations on exposure to fumes, odors, dusts, gases, and poor ventilation. See id. at 314-16. The state physicians' overall conclusion was that Wright was capable of performing light work, as long as Wright avoided any air pollution. See id. at 319.

Wright's treating specialist, Dr. Lewinsohn, also furnished an Assessment of Ability to do Work-Related Activities. Dr. Lewinsohn concluded that Wright's symptoms do not affect his lifting, carrying, standing, walking, and sitting capacity. See id. at 324-25. Wright's symptoms also did not affect his physical functions. See id. at 326. His asthmatic symptoms occasionally affected his ability to climb but did not affect other postural activities. See id. The assessment also reported several environmental limitations including: sensitivity to temperature extremes, chemicals, dust, and fumes. See id. at 327.

Lastly, Dr. Suzuki and Dr. Epler also stated in their treatment notes that Wright should avoid exposure to dust, fumes, and chemicals in his future workplace.  See Tr. at 301, 322. Although Dr. Suzuki and Dr. Epler did not perform full RFC assessments, their opinions still bolster the ALJ's RFC determination in this case.  See Gordils, 921 F.2d at 329.  Since the ALJ's RFC determination accords with the five doctors' findings, I conclude that they provide substantial evidence to support the ALJ's RFC determination.

Although I find that substantial evidence supports the ALJ's RFC determination, I address Wright's contention that the ALJ did not consider all of the medical evidence in his RFC determination.  Wright asserts that the ALJ ignored all of the medical evidence relating to his sinus condition, in the form of the medical records, his treatment regimen, and the side effects of his medications.

The medical evidence that Wright contends the ALJ ignored merely diagnoses and describes Wright's impairments.  This

evidence discusses in detail Wright's respiratory and sinus problems including the related treatments, surgeries, CT scans, etc.  This bare medical evidence, however, does not link the diagnoses to any specific residual functional capabilities such as sedentary or light work.  The ALJ, as a lay person, is not qualified to make the connection between such bare medical findings and corresponding residual functional capabilities. See Gordils, 921 F.2d at 329; Rosado, 807 F.2d at 293.  Accordingly, the ALJ would not have been entitled to rely on that evidence as a basis for Wright's RFC determination.  See id.  Therefore, I find no merit in Wright's argument that the ALJ erred by ignoring the medical evidence relating to his sinus problems.

Wright also argues that the ALJ failed to properly weigh the opinions of Wright's treating specialists regarding his sinus condition.  Wright contends that his treating specialists' medical opinions imply the existence of functional limitations arising from his chronic sinusitis.  Furthermore, Wright claims that the ALJ should have heeded these implied limitations in

making his RFC determination.  The record, however, indicates that Wright's treating specialists did not explicitly discuss any functional limitations related to his chronic sinus condition. See Tr. at 301, 321-22, 327.  Wright concedes that one of his treating specialists, Dr. Lewinsohn, "does not comment on the functional impairment imposed by the chronic sinus condition . . . ."  Pl's Mot. to Reverse and Remand (Doc. No. 7) at 22.

As there are no explicit opinions regarding functional limitations imposed by Wright's sinus condition, the ALJ essentially had no additional opinions to weigh in his RFC determination.  As discussed above, the ALJ also had no authority to infer implied functional limitations from the medical evidence.  See Gordils, 921 F.2d at 329.  Therefore, I find that the ALJ made no error in his RFC determination.

C.   **The ALJ's Reliance on Vocational Expert Testimony**

Wright next argues that the ALJ improperly relied on vocational expert ("VE") testimony based on a hypothetical question that did not include impairments that the ALJ previously

found to be severe.  For the following reasons, I disagree.

Once a claimant proves that he is incapable of returning to his prior jobs, the burden shifts to the Commissioner to come forward with evidence of specific jobs in the national economy that the claimant is capable of performing.  See Arocho v. Secretary of Health and Human Servs., 670 F.2d 374, 375 (1st Cir. 1982); 20 C.F.R. § 404.1520(f) (2000).  The Commissioner can meet his burden of proof on this issue by relying on the testimony of a VE.  See Rose v. Shalala, 34 F.3d 13, 19 (1st Cir. 1994); Berrios Lopez v. Secretary of Health and Human Servs., 951 F.2d 427, 429-30 (1st Cir. 1991) (per curiam).

In order to rely on the VE's testimony, however, the ALJ must pose to the VE a hypothetical question that accurately reflects the claimant's functional limitations.  See id.  That is, the ALJ may credit the VE's response only if there is "substantial evidence in the record to support the description of the claimant's impairments given in the ALJ's hypothetical."  Berrios Lopez, 951 F.2d at 429; see Arocho, 670 F.2d at 375.

At the hearing, the ALJ and the VE engaged in the following dialogue:

    ALJ: Okay. And I'm going to ask you some hypothetical questions this morning which will take into account a number of different factors, but in all of the questions that I pose we are presented with the potential worker who is currently 50 years of age, who has not only a high school education, but an additional Associate's degree . . . in aviation science, and a skilled work background . . . . And someone who is going to have some exertional limitations as a result of his medical condition such that the <u>most that the individual would be able to lift and carry would be 20 pounds maximum</u>, and with any <u>repetitive routine carrying of objects or lifting [of] objects that would be perhaps in the 10-pound range</u>. And if we're dealing with someone who is particularly <u>limited in terms of the environment</u>, that is in terms of breathing and being exposed to a number of factors, and those would be of course the <u>inability to be exposed to dust and fumes and odors</u>, and also if we're dealing with someone who would best be suited to work in an environment where there were <u>no extremes of temperature</u>, particularly cold temperature. In looking at the previous work that Mr. Wright has performed as he did it, and as it is generally performed in the national economy do you feel that he could perform this type of work based on these limitations?

    VE: No . . .

    ALJ: In looking at jobs in the occupational base of jobs other than semiskilled jobs, perhaps entry level types of jobs, do you feel that there would be any other

                examples that could still be performed?
        VE: Yes . . . .

Tr. at 55-56 (emphasis added).  The VE then discussed the type

and number of jobs in the national economy that Wright would be

able to perform given his functional and vocational limitations.

See id. at 56.  The VE stated that Wright could work as a mail

clerk, security guard, office helper, or cashier.  See id.

        There is no merit to Wright's argument that the ALJ erred by

not including any limitations based on his severe sinus condition

in the hypothetical.  As discussed earlier, the ALJ discredited

Wright's complaints of pain and other symptoms and found that

they suggested no additional limitations on his ability to work.

Since these complaints were not supported by substantial evidence

in the record, the ALJ was not required to include any sinus-

related limitations in the hypothetical.[11]  See Berrios Lopez,

_____

        [11]  The ALJ also posed a second hypothetical to the VE that
included the vocational limitation of absenteeism, resulting from
Wright's sinus symptoms.  See Tr. at 57.  The VE responded that
the additional factor of absenteeism would preclude Wright from
engaging in the previously mentioned jobs on a sustained basis.
See id.  Wright argues that the ALJ erred in not referring to
this second hypothetical in his decision.  The ALJ, however, does

951 F.2d at 429.

Moreover, the functional limitations the ALJ did include in the hypothetical were supported by substantial evidence. The limitations concerning Wright's ability to lift and carry and his workplace environment were consistent with the state physicians' RFC assessment. See Tr. at 313-19. Furthermore, Dr. Lewinsohn, Dr. Suzuki, and Dr. Epler all recommended that Wright avoid exposure to dust, fumes, and chemicals. See id. at 301, 322, 324-27. Because substantial evidence in the record supported the description of Wright's functional limitations, I conclude that the ALJ properly credited the VE's response to the hypothetical.

---

not need to address this hypothetical since his findings rejected the grounds for the hypothetical. See Boynton v. Apfel, 172 F.3d 52, Civ. No. 98-1987, 1999 WL 38091, at **4 (7th Cir. 1999) (table, text available on Westlaw). The ALJ ultimately discredited Wright's complaints of pain, and the opinions of his treating specialists did not explicitly discuss any functional limitations arising from Wright's sinus symptoms. As a result, the ALJ was not required to include sinus-related limitations in a hypothetical to the VE. See Berrios Lopez, 951 F.2d at 429. Therefore, the ALJ was also not entitled to rely on the VE's response in deciding whether Wright was disabled because sinus-related limitations were not supported by substantial evidence in the record. See id.

## IV. CONCLUSION

Because I have determined that the ALJ's denial of Wright's application for benefits i s supported by substantial evidence, I affirm the Commissioner's decision. Accordingly, Wright's motion to reverse and remand (Doc. #7) is denied, and defendant's motion for an order affirming the decision of the Commissioner (Doc. #8) is granted. The Clerk shall enter judgment accordingly.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

October 13, 2000

cc:  Raymond J. Kelly, Esq.
     David L. Broderick, Esq.